Dewey, J.
The plaintiff in error was indicted in the Vigo Circuit Court for the murder of George Mickelberry. By a change of venue, on the application of the prisoner, the cause was transferred for trial to the county of Parke, which is in the seventh judicial circuit. JudgeBn/¿m¡í, the president of *that circuit, being absent, Judge McDonald, the president of the tenth judicial circuit, took his place, and presided over the Parke Circuit Court during the trial of the prisoner, which terminated in his conviction and sentence of death. He prosecutes this writ of error to reverse the judgment.
Many objections to the legality of the proceedings of the Court below have been made. Some of them are important in themselves; and others derive an interest from their connection on the present occasion with the life or death of a human being. Aided by able argument of counsel on both sides of the cause, we have given to them all that serious and deliberate' attention, to which a connection so grave and momentous entitles them.
1. It is contended that the Parke Circuit Court had no jurisdiction of the cause, on the ground that the president of another circuit presided over the trial.
This objection is founded on the alleged unconstitutionality of the statute, which authorizes the president of one circuit to preside over and hold a Court for one term, or for a single trial, in another circuit whose president is absent. R. S., 1838, p. 164. It is said that this law conflicts with the three first sections of the fifth article of the constitution. They are as follows:
“ Sect. 1. The judiciary power of this State,both as to matters of law and equity, shall be vested in one Supreme Court, in Circuit Courts, and in such other inferior Courts, as the General Assembly may from time to time direct and estab *322 lish. Sect. 2. The Supreme Court shall consist of three judges, any two of whom shall form a quorum, and shall have appellate jurisdiction only, which shall he co-extensive with the limits of the State. Provided nothing in this article shall be so construed as to prevent the General Assembly from giving the Supreme Court original jurisdiction in capital eases, and cases in chancery, where the president of the Circuit Court may be interested or prejudiced. Sect. 3. The Circuit Courts shall each consist of a president and two associate judges. The State shall be divided by law into three circuits, for each, of which a president shall be appointed, who, during his continuance in office, shall reside therein. The president, and associate judges in their respective counties, shall have ^common law and chancery jurisdiction, as also complete criminal jurisdiction, in all such cases, and in such manner, as may be prescribed by law.” This section prohibits the associate judges from holding Courts, in the absence of the president, for the trial of capital cases, and cases in chancery; and authorizes the Legislature to increase the number of circuits and presidents.
The position taken by the counsel for the prisoner is, that the proviso in the second section is to be viewed as a grant of a specific power , to the Legislature, to provide for the emergency therein named in a particular mannei’, which must be strictly pursued, if that body act at all on the subject ; and that it is a virtual prohibition to afford the remedy in any other manner. This position must be fatal to the law in question, if the Legislature possessed no other power to pass it,than that which is implied by the proviso. But they did possess other power; and it is to be found in the first section of the third article of the constitution, which is—“ The legislative authority of this State shall be vested in a General Assembly, which shall consist of a Senate and Houseof Representatives,” &c. This is not a grant of special, limited, and enumerated powers, implying a negative of all others, as is the case with the constitution of the United States. *323 The legislative authority of this State is the right to exercise supreme and sovereign power, subject to no restrictions except those imposed by our own constitution, by the federal constitution, and by the laws and treaties made under it. This is the power under which the Legislature passes all laws. The inquiry is not whether the proviso confers a power upon the General Assembly, but how far the whole section restricts its power. The first clause of it certainly contains a restriction, and forbids the Legislature from conferring upon the Supreme Court original jurisdiction. The only office of the proviso is to make certain exceptions to the restriction. It confers no power. Were the whole section stricken out, the Legislature would be at liberty to confer either original or appellate jurisdiction, or both, upon that Court. Can it be claimed then, that because this section leaves the Legislature free to remedy an evil, which the convention foresaw, in one way, it forbids every other mode of relief? The Legislature *is competent to erect such other Courts besides the Supreme and Circuit, as it may see fit. Suppose it should establish in each county another tribunal with jurisdiction as ample as that of the Circuit Courts, might not that tribunal take cognizance of all capital cases and suits in chancery? We can not doubt it; and we see nothing in this section which forbade the Legislature, in the exercise of its general authority, to pass the law under review, though the effect of doing so is to do away the necessity of conferring original jurisdiction on the Supreme Court in any case, and though the emergency pointed out in the proviso is incidentally provided for by a mode of redress not therein indicated.
The argument against the validity of the law drawn from the third section has more force, but is not, we think, conclusive. The first branch of this section prescribes, that the Circuit Courts shall each consist of a president and two associate judges, with out designating what president or what associates. The clause which does designaté them is susceptible of two constructions without a violation of its letter. *324 It may mean the resident president of his own circuit, or the president of any circuit, together with the two associate judges in their respective counties. If the provision that the president of each circuit shall reside therein, can be accounted for independently of a design to make him a component part of the Courts in his circuit, it is not clear that the spirit, of this clause is not consistent with the latter interpretation. We think it can beso accounted for., A president judge has \.iany duties to perform without reference to his functions in Court, which render it very desirable that each citizen of his circuit should have easy access to him; such as granting injunctions, authenticating clerk’s certificates, &c. Under this construction, the constitutionality of the law is placed beyond a doubt. But perhaps the other is the true reading, that is, the president of the circuit to which he belongs and the associate judges of that circuit in their respective counties shall constitute the Courts. Admitting this to be the sense, it remains to inquire, what is its effect upon the legislative authority of the General Assembly ? It must not be forgotten, that the third section no more than the second contains a grant of power. It is restrictive upon the general ^authority of the Legislature. It limits the number of the Circuit Court judges, designates the associates of each by reference to their residence, and requires the president to reside in his circuit. But does it take from the Legislature the right to empower a president, under any circumstances and for a temporary and specific purpose, to hold a Court in the circuit of another president? It is believed that the same rigid rule of criticism, which would construe this part of the constitution into such a prohibition, would deny to the Legislature the right to authorize the Circuit Courts to exercise any jurisdiction out of the counties in which they are held, the president out of his circuit, and the associate judges beyond the limits of their respective counties; and also, from conferring on the Circuit Coui’ts other than common law (civil and criminal), and equity jurisdiction. Now, the constitution has received a *325 practical construction, in these respects, coevil with the existence of the State. The first Legislature empowered the Circuit Courts to issue subpoenas and executions, and each of the judges in certain cases to issue warrants, into all the counties in the State; and the Circuit Courts were many years ago authorized to take the probate of wills, graut letters testamentary and of administration, &c , powers which do not pertain to common law or chancery jurisdiction. Whence did the Legislature derive their power to do this? Not from the section under notice, for that speaks only of common law and chancery jurisdiction. It derived it from its general power; and the constitutionality of none of the provisions above referred to has ever been doubted. Upon ■what principle of distinction is it that the law which is now doubted, is to be distinguished from these in regard to the right to pass it? Why is it that the General Assembly can authorize a president to send a valid warrant out of his circuit, but can not authorize him to hold a court beyond its limits? It was foreseen b}r the convention, that the interest or prejudice of a president judge would sometimes disqualify him from sitting in Court, and that the associates would be left wfithout jurisdiction in capital cases, and chancery suits. Here, certainly, was a contingency on the happening of which the president was not expected, for the time being, to hold a Court in his own circuit. Now, what is there in the *third section to prevent the Legislature from supplying his place, while the disqualification lasts, by the president of another circuit ? The latter surely might perform that office without removing his place of residence, and without ceasing to be a member of every Court held within his usual limits. This, we apprehend, is all that any construction of the third section can require.
We are by no means prepared to say that any part of the constitution, either in letter or spirit, so restrains the general authority of the Legislature as to prohibit it from passingthe statute which we have under consideration. If, indeed, the framers of the constitution had rendered it necessary that the *326 Supreme Court should try capital cases when the president of a circuit in which they may happen is interested or prejudiced, they would have entailed upon the country a very serious evil. The necessity of bringing juries, and witnesses, and parties from the remote parts of the State to the seat of government; the expense, the delay, the trouble, the great uncertainty in the administration of justice attendant upon such a trial, would produce a state of things which ought to be avoided if possible. The law in question does avoid it. Besides, this law has been in force about five years. Many important decisions in chancery, and some in capital cases, may have been made in Courts organized under it. If it be unconstitutional, all such proceedings are void. The consequences are evident. Before we can consent to open a door to them, we must have the fullest conviction that stern duty demands it at our hands. We have not that conviction. We are not satisfied that the general authority of the Legislature is so trammelled by any portion of the constitution as to be incompetent to pass this beneficial law. We had this subject under consideration on a former occasion, and after much reflection, came to the same conclusion which we now express. If the views here advanced do not leave the constitutional question in regard to this law free from all difficulty, we feel well assured they involve it in too much doubt to authorize us to declare the statute a nullity.
2. The next objection is that the grand jurors who found the indictment do not appear by the record to have been freeholders or householders.
*The caption of the indictment represents them to be “good and lawful men.” This general representation of the qualifications of grand jurors' has always been held to be sufficient, even when the record comes from a Court of special and limited jurisdiction ; if it comes from a superior Court, even the omission of these words is not fatal, because all men shall be presumed to be “ good and lawful” until the contrary appears. 1 Chitt. C. L., 333; Bac. Abr. Indictment, 1; 2 Hawk., c. 25, s. 17.
*327 3. It is alleged there is uncertainty in the time and place of swearing and chargingthe grand jury. The caption shows that at the May term,1841, of the Vigo Circuit Court; and on the third day of that month, the jurors (naming them) appeared in Court, and being duly sworn and charged, &c. The defect complained of is the omission of the words “then and there” before “sworn and charged.”
The ease of The People v. Guernsey, 3 Johns. Cases, 265, is relied on to support this objection. It appears to us that it has a contrary hearing. The omission of the words “ then and there,” in reference to the swearing and charging the grand jury, was, indeed, held to be a fatal defect in the caption of the indictment. But the decision turned on the fact that the record was certified from a Court of inferior jurisdiction, and it admitted that the law is otherwise when the indictment is from a superior Court. Our Circuit Courts are vested with public and very ample jurisdiction, and are not, in contemplation of law, inferior Courts. That writs of error lie to them from the Supremé Court does not give them that character "Writs of error run to the English. Common Pleas from the King’s Bench, and to both from the Exchequer Chamber; but these tribunals have always been ranked among the superior Courts, the highest indeed in the kingdom. The principal object of the caption is to show the jurisdiction of the Court in which the indictment was found. More certainty, therefore, is requisite when it is brought from a Court of special jurisdiction than when it comes from a superior Court. In the latter case, the omission of the words “ then and there,” in respect to the swearing and charging the grand jury, is not fatal; and it may be well doubted *whether it is in any case. 1 Chitt. C. L., 334; 2 Hawk., c. 25, s. 126; Bac. Abr. Indictment, 1; Archb. C. P., 24.
4. It is next objected, that it does not appear the indictment found against the prisoner in the Vigo Circuit Court was recorded there; and, therefore, no evidence exists that *328 that indictment is identical with the one on which he Avas tried in the Parke Circuit Court.
The statute authorizing a change of venue directs, upon a change being ordered, that the papers in the cause shall be sent to the proper Court, the clerk of which is to docket the cause; the Court to which the venue is taken is to proceed as the other Court would, had no change taken place; R. S., 1838, p. 602. As the record is never made up until final judgment, which in this cause necessarily took place in the Parke Circuit Court, we do not think it was requisite to record the indictment in they^o Circuit Court. Nor do we see any difficulty as to the identity of the indictment. The record shows that the prisoner was indicted in th eVigo Circuit Court for the murder of George Mickelberry; that he pleaded there “ not guilty;” that he procured a change of venue for his trial upon that indictment to the Parke. Circuit Court; that the clerk of the former Court handed over the papers, and among them the indictment (which is spread upon the record), to'the clerk of the latter Court in which they were filed ; and that the prisoner was placed upon his trial in that Court for the murder of George Mickelberry upon the plea of “ not guity theretofore entered in that behalf.” No objection was made by the prisoner to the indictment upon which he was tried. If more were wanting to establish the identity of the indictment, it is to be found in the statement in the record, that the indictment which was recorded in the Parke Circuit Court, and upon which the prisoner was tried, is the one which was transferred among the papers of the cause.
5. In impanueling the traverse jury, four jurors were called; three of them were accepted and one was challenged by the prisoner; and another was called and accepted by him ; thereupon the State peremptorily challenged one of the first three, and the challenge was allowed.
There was no error in this. The State had a right to three peremptory challenges. Wiley v. The State, 4 Blackf., 458. *And either party may challenge at any time *329 between the appearance and the swearing of the jury. 1 Chitt. C. L., 545.
6. On the trial, the prisoner produced a witness, who gave evidence as to his character, and made reference in his testimony to rumors that had followed him as to his character in a neighbourhood where he had formerly lived; upon which the counsel of the State asked the witness: “ Do you know the general character of the prisoner in his neighbourhood, as to his former conduct?” An objection to the question was overruled. The witness answered in the affirmative, and said the prisoner’s character was unfavourable. The admission of this testimony is alleged to be error.
The law is that, in prosecutions for crimes, the prisoner may call witnesses to his general character, and, afterwards, the State may rebut their testimony by proving his general character to be bad. Ros. C. Ev., 72, 73; 2 Stark. Ev., 304. It is usual to put the question as to the general character of the prisoner, in such a form as to have reference to the particular crime with which he is charged ; but we have found no authority that it may not be asked in the unqualified form in which it appears in the record, leaving out the words “ as to his former conduct.” We consider those words as no qualification of the question. The general character which a person sustains ulways depends upon his previous conduct. Besides, the question was put in cross-examination, and it does not appear (-whether it be considered as qualified or not) *to have been irrelevant to the testimony which the witness had given for the prisoner. We think there was no error in suffering the question to be asked and answered.
7. The prisoner having proved that a witness for the prosecution had made former statements inconsistent with her testimony, the State was permitted, against the objection of the prisoner, td prove that the witness had also made statements corresponding with it.
We have had the question now presented under consideration on a former occasion. We then came to the conclusion, that if a witness be impeached by proof of previous *330 statements inconsistent with his evidence, he might be supported by showing other statements made by him agreeing with it. Coffin v. Anderson, 4 Blackf., 395; see, also, Jackson v. Etz, *5 Cowen, 314. On reviewing the authorities on this subject, we do not feel disposed to overrule this decision.
8. The prisoner offered to prove by the son of the deceased (who had been sworn for the prosecution), that he, the witness, and the widow of the deceased, who had also been examined by the State, had employed counsel to assist the attorney prosecuting for the State in conducting the prosecution against the prisoner, and had agreed to pay him a fee conditional on conviction. The evidence was objected to. The Court admitted pi’oof of the employment of the assistant counsel, but rejected the testimony as to the character of the fee. The prisoner excepted.
Any circumstance tending to bias a witness for or against a party—such as natural kindred, affinity, fellowship in a common cause, or ill-will—is a matter proper for the jury in estimating the credit.of a witness. Iu the cause before us, if the fact that the widow and son of the deceased had employed counsel against the prisoner, can be supposed to have evidenced a stronger bias in their feelings than must have necessarily grown out of their situation,he has had the benefit of that fact. Whether the fee was conditional or not,we think was entirely unimportant under the circumstances of the case.
9. It appeared in evidence, that the prisoner went to the house of the deceased to inquire into something which his daughter had said of him. They had an interview in which the prisoner became furiously angry, and uttered threats. While his wrath was yet high,the deceased entered the room and interposed, using the language of remonstance. The prisoner drew a knife, and plunging it into his breast, killed him instantly. The blade of the knife was six inches long and one and a half wide. The prisoner immediately made his escape. The Court instructed the jury, that if homicide *331 be committed in a sudden heat by the use of a deadly weapon, no provocation given by mere words will reduce the killing to manslaughter; that “the question should never be, was there anger merely, but, was there legal provocation to such anger?” that the use of a dangerous weapon under a provocation by words only, or under no provocation, was always evidence of malice aforethought; that to Constitute malice aforethought, it was only necessary that there should be a formed design to kill, and that such design might be conceived at the moment the fatal stroke was given, as well as a long time before; that malice aforethought, means the intention to kill; and that when such means are used as are likely to produce death, the legal presumption is that death is intended. To these instructions the prisoner excepted.
■ Two objections are urged against them, 1st, That it was incorrect to charge the jury, that mere words did not constitute a sufficient provocation to mitigate the killing a man with a deadly weapon, under the influence of sudden passion, to manslaughter; and, 2d, That the instructions improperly withdrew from the jury the right of determining with what intention the weapon was used.
With regard to the first objection, we have.carefully examined all the cases referred to by the counsel for the prisoner, and thoroughly reviewed the whole current of authorities on this subject. It is useless to give them here in detail. There can be no doubt as to the result It is, that no gestures or words of affront, however well calculated to arouse a just indignation, however furious the passion which they may actually excite, are an adequate provocation to alleviate homicide, effected by a deadly weapon, from murder to manslaughter. To have that effect, the provocation must consist of personal violence. Whether this rule be wise, whether it be the best which can be devised to guard human life from brutal rage, and at the same time to palliate human frailty, is not for us to say. We imagine, however, that society would be no gainer by substituting in its place a fluctuating princi- *332 pie, by which each man shall be judged according to the excitement natural to his peculiar temperament, when aroused by real or fancied insult given by words alone. That the law is as we have stated it, the following authorities most clearly establish. Brains’s case, Cro. Eliz., 778; Oneby’s case, 2 Lord Rayan., 1485; 1 Hawk., c. 31, s. 33 ; 1 East’s C. L., 233; Fost., C L., 290, 291; 1 Russ, on C.,435; Ros. C. Ev., 557. The question has been raised, whether our statute has not introduced a change into the law respecting manslaughter, in reference to this point of sudden heat and *provocation. We think not; the statute has adopted the common law definition of the crime, and does no't alter any of the rules by which it is to be governed. The second objection to the instructions is also without foundation. Express malice consists in a preconceived design to destroy life unlawfully, or do some great bodily harm, and may be evidenced by threats, lying in wait, &c. Here, the existence of the intention is a matter of fact to be found by the jury, “ Implied or constructive malice,” says Mr. Starkie, “ is not a fact for the jury, but is an inference or conclusion founded on the particular facts and circumstances ascertained by them.” 2 Stark. Ev., 711,712. There is in every homicide implied malice, but facts and circumstances in alleviation,excuse,or justification, maybe adduced, the truth of which it is the province of the jury to determine; bqt whether, if true, they be sufficient to rebut the implied malice, is a matter of law for the Court. Fost. C. L., 255. Oneby's case, supra; Strange, 773. When provocation is relied upon in defense, the nature of the weapon used by the prisoner in producing death is always an important consideration, as tending to show the presence or absence of malice. If a deadly weapon, that is, one likely to produce death, be used, the legal presumption is that death was intended, which is evidence of malice. Ros. C. Ev., 557; 2 Stark. Ev., 713, 722. We do not perceive that the instructions violate any of these principles, and believe them to be correct. With regard to the actual intention of the prisoner to kill the deceased, *333 there is no room to doubt. The weapon was of the most deadly nature, and was aimed directly at the heart.
J. Whitcomb and T. A. Howard, for the plaintiff.
H. O’Neal, for the State.
We have thus gone through all the objections raised against the legality of the prisoner’s sentence; they were urged with much ingenuity, and have been maturely weighed. But, with more pain at the result, than difficulty in deciding, we are constrained to pronounce that the judgment of the Circuit Court must be affirmed.
Per Curiam.—The j udgment is affirmed, with costs.