# REPUBLIC OF HAWAII *v.* KAPEA, KAIO and UPAPA.

## EXCEPTIONS FROM CIRCUIT COURT, FIRST CIRCUIT.

### SUBMITTED JANUARY 11, 1898.    DECIDED FEBRUARY 3, 1898.

### JUDD, C.J., FREAR AND WHITING, JJ.

1. Special terms of the Circuit Court when called in pursuance of and in accordance with the statute, have jurisdiction to try all indictments presented, whether presented at a previous regular term or not and though the accused had been committed to be tried at a term subsequent to the special term. District Magistrates should commit accused for trial at the "next term" of the Circuit Court and not designate the date of the term.

2. An indictment for murder in the first degree describing the offense is not fatally defective because in its conclusion it does not name the deceased.

3. Where a cause has been tried by an impartial jury, the disallowance of a juror for a cause of questionable sufficiency is not ground for reversal; nor when a juror once accepted is thereafter challenged peremptorily; nor when once accepted he is recalled to answer questions suggested either by the juror himself or from the examination of other jurors, and is thereafter challenged peremptorily or excluded by the court, provided the jury is not sworn and no evidence has been taken.

4. It is not reversible error for the court to decline to order the marshal to allow counsel for defense to have a private interview with certain witnesses for the prosecution who are in custody of the marshal held under a statutory commitment.

5. Questions on the redirect may be allowed in the discretion of the court to enable the witness to make his meaning clear, though not directly connected with any matter brought out on the cross examination, the witness having admitted that he had told some untruths in his previous testimony.

6. Where evidence has been introduced on behalf of the defense without objection and undisputed by the prosecution, showing the commission of larceny by a witness for the prosecution of the goods of one of the family of defendants and the demand of a certain sum of money to stop prosecution was paid by the said witness, it is harmless error to forbid further evidence on the facts of the larceny, there being no express proof of ill will or bias on the part of the witness towards or against the owner of the goods stolen.

7. Admission of a defendant that he opposed and forbade the commission of a murder is admissible as evidence of his knowledge of the intention to commit the murder.

8. On the trial of a person for the offense of murder in the first degree, where there is no evidence upon which the jury can find the defendant guilty of an offense of a lesser degree than the one charged, it is not error to charge the jury that if they believed the evidence of the prosecution they should find the defendant guilty of murder in the first degree or not guilty if they disbelieved the evidence.

9. By statute questions of law are for the court and the instructions of the court in relation to the law are binding on the jury. (Chap. 57, Sec. 4, Laws of 1892.)

10. The statute (Page 250, Penal Laws) requires that in a capital case at least forty-eight hours shall intervene between a verdict of guilty and the sentence. The term of the court would expire by limitation within forty-eight hours after verdict. Held, it was not error to postpone the rendition of sentence to the next term of the court.

### OPINION OF THE COURT BY JUDD, C. J.

One of the exceptions in this case is to the refusal of the Circuit Court, First Circuit, Judge Perry, presiding, to grant a motion for a new trial, made on the ground that the verdict was contrary to law and the evidence and the weight of evidence. We therefore review the facts claimed to have been proven by the prosecution in order to dispose of this exception and to a clear understanding of the case.

The case of the prosecution is that on Friday, the 24th of September, 1897, at about 10 o'clock in the evening, Doctor Jared K. Smith, while writing in his office in his residence at

Koloa, Kauai, was called to the office door by a knock, and on
asking in the Hawaiian language "Who is that?" received only
an inarticulate reply from a person standing below near the
verandah. The doctor then came to the double blind door, open-
ed one-half of it, and just as he had stepped on the verandah,
received a pistol shot in his breast from a person standing there.
Uttering a scream indicating pain he fell back and in a few
seconds was dead. The bullet passed through both lungs and the
heart. . The assailant then mounted his horse, and rode off
rapidly. The above recited facts are well established and are
uncontradicted. At first the officers and the community were
completely in the dark as to who could have perpetrated this
assassination. Dr. Smith's character as a most kind and benevo-
lent physician and friend to all and especially to native Hawai-
ians, made it seem incredible that any one and especially an
Hawaiian could do this deed. Later, suspicion rested upon a
family living near the sea some two miles away, because Dr.
Smith in his official capacity as local physician and agent of the
Board of Health had, about a fortnight previous, notified a
woman named Paupau and her daughter named Pua of the
said family, that they must report themselves to the Board of
Health at Honolulu, there to be examined and treated, and in
case it was decided that they had leprosy, of which Dr. Smith
saw signs on them, that they would be sent to the Leper Settle-
ment on Molokai. The time of their going was near at hand.
The family spoken of consisted of the woman Paupau, Kaio a
half-Hawaiian with whom she was living, Pua the daughter of
Paupau about twelve years old, Kapea a son of Kaio, about
twenty years old, Iosepa Kaahea aged about nineteen and his
brother Johnny Kaahea, aged about sixteen, nephews of Kaio.
These last three were living on the premises owned by Paupau,
though generally sleeping in a separate house and were em-
ployed from time to time by Kaio in helping him do various
jobs of plowing, cattle driving, etc. On the night of the mur-
der all these persons slept in the main house with Paupau and
Kaio. Besides them there slept there two little children of

Paupau's, also one Upapa, a middle aged Hawaiian, and one part-Hawaiian George Rathburn and a woman named Ainoa with whom he was living. When the authorities from Honolulu arrived at Koloa, searching examinations of all these parties except the little children, was had, and, at first no incriminating facts came to light, but little by little, inconsistent statements and partial admissions fell from some of them and finally both Iosepa and Johnny Kaahea made full disclosures and were made state witnesses. Their narrative was, in short, that Kapea, being incensed that the girl Pua to whom he was or had been bethrothed was to be taken away, determined to kill the doctor saying that "his head would not rest till he had killed him." He was joined in this purpose by Kaio for a similar reason. Iosepa readily agreed to assist his cousin. Kapea and Iosepa on Tuesday, Wednesday and Thursday nights went out on horseback in search of the doctor, hoping to find him alone and way-lay and kill him. They provided themselves with pistols and Kapea took also a hatchet. They were not successful thus far. On Friday night, September 24th, the two rode up to the doctor's premises, watched for him a while behind bushes in the yard and being satisfied that the doctor was in his office, brought their horses near the verandah steps in front of the office, and, while Iosepa held the horses Kapea went and knocked at the verandah post; the doctor asked "Who is that?" Kapea grunted in reply, the doctor then opened one of the blind doors, came out and, as he was replacing his suspenders over his shoulders, Kapea jumped on to the verandah, being about three feet from the doctor, and shot him in the breast. As the doctor fell backwards uttering a cry Kapea and Iosepa mounted their horses and rode off rapidly, riding at first away from the direction of their own home and finally by a round about course reached Paupau's house. The road they took was over twice as long as the direct and usual road. They then unsaddled their horses, and hid their pistols near by. Johnny testified that Kapea, on his and Iosepa's return to Paupau's house, recited these events to him and Kaio, boasting that "his pistol had

feasted on a man and his anger was appeased." They all then found sleeping places in Paupau's house. Not long after this and before they had got to sleep, some police officers came there who asked if all the inmates of the house were asleep. Then they came into the house and told the inmates the news that Dr. Smith was shot and dead; to which they made exclamations indicating surprise and sorrow. Very early next morning Kapea and Iosepa hid their pistols more securely, and Kaio, Upapa and Kapea went up to the doctor's in order to see the body and while there expressed to the family their grief at the death of so kind a friend. Upapa seemed especially overcome with grief and tears. Both Iosepa and Johnny testified that each night, before setting out to waylay the doctor the family drank awa, Kaio and Kapea before drinking it would mutter prayers to Jehovah and their "aumakuas," asking for success in their plans and for protection from discovery. On Wednesday night, not finding the doctor on the previous nights, Kapea and Iosepa set one of his cane fields on fire, hoping that the doctor would come out to see the fire quenched and on his way home through cane fields they determined that the one that met him should shoot him. The fire was put out by the doctor's men without his being obliged to leave the house.

The jury believed the testimony and found Kapea guilty of murder in the first degree. Kaio, who had made incriminating admissions in addition to the direct testimony against him that he instigated and helped plan the murder, the jury found guilty as an accessory before the fact, which by the statute subjected him to the same punishment as Kapea. Upapa was found guilty of being an accessory after the fact. Rathburn was acquitted.

We do not consider it essential to go further into the details of the evidence which corroborate the testimony of the principal witnesses. We find that the evidence well sustains the verdict and accordingly overrule the exception made on the contention that the verdict is contrary to law and evidence. Seldom has there occurred in these Islands a homicide in which the

proofs show with as great clearness that the killing was with deliberate, premeditated malice aforethought.

The defendants were, on the 30th September, 1897, charged with this crime before the District Magistrate of Koloa, Kauai, and, waiving examination, were committed for trial at the March term following of the Circuit Court, Fifth Circuit. Deeming it essential to the promotion of justice, the Circuit Judge of the Fifth Circuit, with the written approval of the Chief Justice of the Supreme Court, who concurred in the view of the Circuit Judge, ordered convened a special term of that Court to be opened on the 6th of November, 1897. This is authorized by statute, Civil Laws, p. 456 (Ed. of 1897). On the 10th of November, before the Circuit Court of the Fifth Circuit, an indictment was presented against the defendants who, by counsel, objected (1) to the jurisdiction of the Court to try them at that special term, on the ground that defendants were committed to be tried at the March term, 1898, and that special terms can be called only when there is an accumulation of business left unfinished at the previous term. This contention is unsound. Discretion is vested in the Circuit Judge, the Chief Justice approving, whenever they deem it *"essential to the promotion of justice"* to order special terms. Their discretion cannot be inquired into, unless abused. Moreover, the committing magistrate should have followed the statute (Penal Laws, p. 226) and committed the defendants to "the Circuit Court of the Fifth Judicial Circuit," not mentioning the term. The mittimus reads that way. The special term having been called, it was the duty of the Attorney General to arraign the defendants at that term because it is required by the statute (Penal Laws, pp. 227-8) that "the presentation of an indictment against an accused shall not be deferred beyond the term of the Court having jurisdiction of the alleged offense next succeeding the commitment of the accused by a magistrate having competent jurisdiction therefor," and failure to do this would operate as an acquittal. A court at a special term ordered in compliance with the statute has all the

jurisdiction and powers that it has at regular terms. No statute or precedents are cited to the contrary. In favor of our position are *People v. Carrabin*, 14 Cal. 439; *State v. Moran*, 7 Iowa, 236. See *King v. Lee Fook*, 7 Haw. 249. We overrule this exception 1, as well as exception 2, made upon a motion to quash the indictment on the same grounds, in the Circuit Court, First Circuit, to which the case had been removed on motion of defendants, the change of venue not being opposed by the prosecution. In the Circuit Court, First Circuit, the defendants at its regular session, being arraigned on the 13th November, demurred (exception 3) to the indictment, claiming that both counts charging Kapea were defective. The second count is as follows:

"And the Attorney General aforesaid, upon his official oath aforesaid, doth further say and present that the said Kapea, a native Hawaiian by birth, of Koloa, Island of Kauai, Hawaiian Islands, at Koloa in the Island of Kauai and within the jurisdiction of this Honorable Court on the twenty-fourth day of September in the year of our Lord One Thousand Eight Hundred and Ninety-seven, with force and arms in and upon one Jared K. Smith feloniously, willfully and of his deliberate, premeditated malice aforethought and without authority, justification or extenuation by law, did make an assault with a certain pistol then and there charged with gunpowder and leaden bullets, which said pistol he the said Kapea then and there feloniously, willfully and of his deliberate, premeditated malice aforethought, did discharge and shoot off to, against and upon the said Jared K. Smith, and that the said Kapea with certain of the leaden bullets aforesaid out of the pistol aforesaid discharged and shot off as aforesaid, then and there and thereby gave to him the said Jared K. Smith, a certain mortal wound or wounds, of which said mortal wound or wounds the said Jared K. Smith then and there died.

"And so the Attorney General aforesaid, upon his official oath aforesaid, doth say and present that the said Kapea, in manner

and form aforesaid then and there feloniously, willfully and of his deliberate, premeditated malice aforethought and without authority, justification or extenuation by law, did kill and murder and did then and there and thereby commit the crime of murder in the first degree, contrary to the form of the statute in such case made and provided."

The defendant claims that it is essential that defendant be charged with the *murder* of the *deceased*, naming him. Undoubtedly the precedents under the common law require this. *Dias v. State*, 7 Blackford 20. The words usually employed in the conclusion of the indictment are that "A. B. him the said C. D. did, etc., kill and murder," etc. The deceased is not named in this part of the indictment. But the allegations of fact previous to the conclusion set forth that Kapea on the day and at the place mentioned of his deliberate, premeditated malice aforethought shot Dr. Smith, inflicting a wound of which he then and there died. The legal inference from the above recital of facts, in the conclusion of the indictment, is that defendant committed the crime of murder in the first degree. No new facts are recited in the conclusion. It would therefore not be necessary to prove the conclusion. In this country there are no common law offenses. Why then should it be essential that an indictment contain all the ingredients required by the common law? All the Constitution (Art. 7) requires is that the indictment "describe" the offense. The Criminal Procedure Act, Sec. 629 Penal Laws, p. 232, prescribes that "no indictment for any offense shall be held insufficient for want of an averment of any matter unnecessary to be proved,". * * "or for want of a proper or formal conclusion." See *Evans v. People*, 12 Mich. 27; *State v. O'Neil*, 23 Iowa, 272; *State v. Stanley*, 33 id. 526; *State v. Huff*, 12 Nev. 140. This statute was passed in order to temper the rigorous requirements of the common law as to indictments, invented by courts who stood between despotic and cruel governments and accused persons and allowed them loopholes of escape they having scarcely any rights in defense.

The defendant was arraigned and convicted upon an indictment which in its second count described his offense. This count being good, the want of a proper conclusion not vitiating it, we have no occasion to pass upon the constitutionality of the first count.

The defendants pleaded not guilty and the court proceeded to get a jury. Defendant's exceptions numbered 4, 5, 6, 7 and 8, are all to the court's rulings upon questions as to the qualifications of certain persons called as jurors. The persons in question are Keli Keaunui, W. Kaapa, D. H. Kahanamoku, J. Kealohakui and M. Keohokalole. None of these persons were sworn or sat on the trial, all having been excluded for cause by the court or challenged peremptorily by the prosecution or defense, and the defense did not exhaust their peremptory challenges.

The defendants claim that the objections to the competency of the juror Keli Keaunui were invalid and that he was qualified and was improperly excluded. Also that the juror J. Kealohakui was shown to be incompetent, but was passed by the court and the defendant was obliged to challenge him peremptorily. But if at the conclusion of the examinations the challenges of the defendants were not exhausted they cannot complain. *Queen v. Leong Man*, 8 Haw. 340. M. Keohokalole, D. H. Kahanamoku and W. Kaapa were severally "passed for cause" by the prosecution; but on some new matter coming to the knowledge of the prosecution either made voluntarily by the jurors or drawn out on cross-examination as to their relationship to one of the defendants or as to having been conversed with by a son of one of the defendants, they were re-examined, and W. Kaapa and D. H. Kahanamoku were excluded by the court and M. Keohokalole was peremptorily challenged by the prosecution.

Further objections were made to the examination of W. Kaapa. After he had been excluded by the court the prosecution was allowed in the presence of the jury to question him closely into the facts of a conversation between him and one

Pahia, said to be a relative of one of the defendants; the result showed that the conversation was harmless and we cannot see how it prejudiced the jury. *People v. Durrant*, 116 Cal. 179.

The Am. & Eng. Ency. Law says on these points: "In the trial of challenges to the favor, the decision of the judge as to the indifference of the juror is final and cannot be reviewed. From this it is natural to hold that a judge may in his discretion exclude from the panel a juror who is not legally disqualified to sit, and that exceptions will not lie to the act." 12 Ency. 360.

Thompson & Merriam on Juries, Sec. 271, expresses the same view as follows: "Where a cause has been tried by an impartial jury, although the judge, on the application of one of the parties and against the consent of the other, may have rejected a juror for a cause of questionable sufficiency, such rejection does not afford a ground of complaint, if justice has been done in the premises. In other words, while the disallowance of a cause of challenge will work a reversal of the judgment, an improper allowance of a cause of challenge will not necessarily have this effect. A qualified juror may be rejected, and still a jury of lawful men, against whom there is no objection may be obtained."

Cases sustaining this view are cited and are very numerous. See *Sutton v. Fox*, 55 Wis. 531. The discretion vested in courts is large, and its action is not subject to revision unless some law is violated or the exercise of a gross and injurious discretion is shown.

The second cause of objection is that the prosecution was allowed to challenge peremptorily some jurors after it had accepted them. There is authority that the court is not bound to suffer the case to proceed, even after the jury has been empanelled and sworn, when informed of a fact going to the disqualification of a juror from which it is probable that the verdict may be set aside —if no evidence has been introduced. Thompson & Merriam on Juries, Sec. 273, and cases cited. We need not go as far as

this.  The jury was not sworn.  But, there occurring to the prosecution reasons for objecting to the juror not known to be existing when the juror was accepted we see no reason why the granting of a peremptory challenge at that stage was objectionable.

*State v. Potter*, 18 Conn. 166, is cited by defendant's counsel against this view, but in that case the court had told counsel for defendant to exercise their premptory challenge on a certain juror, no cause of challenge being known against him.  Counsel declined to do so as the panel was not full and the juror was directed "to take his seat."  After the panel was full, counsel for defendant moved to be allowed to challenge the juror peremptorily.  The court asked if anything had occurred which called for the exercise of this right.  Counsel answered there had not and the court denied him the right, reasoning that by the practice of the court it had the right to direct the time when the peremptory challenge should be exercised and the opportunity closed when the juror was directed to "take his seat."  Other courts take the contrary view and hold that peremptory challenges may be made up to the moment of swearing the jury and that is our practice.  Some of the cases are *Hooker v. State*, 4 Ohio, 350; *Beauchamp v. State*, 6 Blackf. 299, 308; *Morris v. State*, 7 Blackf. 593, id. 607; *People v. Reynolds*, 16 Cal. 128; *People v. Durrant*, 116 Cal. 179.

We overrule this exception.

Exception 9.  The defendant's counsel moved that the court order the marshal to allow them a "private interview" with the witnesses, Iosepa and Johnny.  These persons having "turned state's evidence," were upon a statutory order of the Judge of the Fifth Circuit Court, committed to jail and were in the custody of the marshal.  The court refused the motion.  Counsel for defense contend that the statute authorizing the commitment of a witness to jail is unconstitutional.  The complete answer to that is that it is not the right of the defendants to make this objection.  Only the parties affected can make the attack,

and, so far as it appears, the witnesses were willing to remain in custody. We know of no obligation resting upon the prosecution to allow the accused to know what the state's witnesses will testify to in advance of the trial. Defendants had waived preliminary examination and they lost the benefit of the witnesses' statements before commitment. Their counsel had access to the evidence of these witnesses taken before the coroner. They had and exercised the right to a full cross-examination of the witnesses before the jury. We question the authority of the court to make any such order.

Exceptions 10 to 16 are to the court's allowing certain questions to be put by the prosecution to Johnny Kaahea on the redirect. They are as follows:

(10) "That thereafter Johnny Kaahea was called as a witness and testified on behalf of the prosecution and after being cross-examined counsel for the prosecution proceeded to examine the witness on the redirect and asked him the question, "The Saturday that Kaio and the others went up to the house, up to the doctor's, to see the body, whose proposition was it to go?" To which the witness replied "Kaio's." Then counsel asked, "And what did he say?" Defendants objected to said questions and answer on the ground that it was not proper redirect examination and did not relate to any new matter elicted on cross-examination. The court overruled the objection, defendants excepted and the exception was allowed.

(11) That counsel for the prosecution further questioned the said witness as to why he thought Kaio went to the doctor's house to cover guilt, whereupon defendants again objected to the testimony as not being proper redirect examination. The court overruled the objection, defendants excepted and the exception was allowed.

(12) That counsel for the prosecution then asked the said witness whether he desired to make any other corrections in his testimony. Defendants objected to the question as not being proper redirect examination. The court overruled the objection, defendants excepted and the exception was allowed.

(13) That, continuing the examination, counsel for the prosecution asked said witness the following question, "Rather than any statement that came from these defendants, you just now said that you wished to correct that statement in reference to "hoonalonalo," that is, that it is a thing that came from you. Do I understand that as you now correct it you wish to state that these defendants did not actually make such statements but that it was your impression and belief?" Defendants objected to the question as being improper redirect examination and leading. The court overruled the objection, defendants excepted and the exception was allowed.

(14) That to the said question the witness replied, "The idea came out from Kaio," whereupon counsel for the prosecution asked, "When was it that Kaio said that?" Defendants objected to the question as not being proper redirect examination. The court overruled the objection. Defendants excepted and the exception was allowed.

(15) That continuing the examination of the witness, counsel for the prosecution asked him the question, "Now then, have you any other correction to make?" Defendants objected to the question as not being proper redirect examination. The court overruled the objection, defendants excepted and the exception was allowed.

(16) That continuing the examination of the witness, counsel for the prosecution asked him the question, "Now, on your statement as it now stands, with those corrections, have you told to the best of your knowledge and belief the whole truth in reference to this case against the defendants?" Defendants objected to the question as not being proper redirect examination. The court overruled the objection, defendants excepted and the exception was allowed."

The witness had said on the direct that, by the direction of Kaio, all the family but Iosepa and Johnny on Saturday morning went to see Doctor Smith's dead body in order to conceal ("hoonalonalo") their guilt and that Iosepa and Johnny should

remain at home lest they should let out something that would lead to discovery. Johnny had on cross-examination made some contradictions of parts of his testimony and had admitted that he had told some untruths. On redirect he said that this going of some of the family to see the body was not by Kaio's express direction but that it was his own idea and belief that they did so to conceal the crime. We think it was within the discretion of the court to allow some latitude in this examination for the purpose of getting at the exact truth and so far from the replies prejudicing the defendant Kaio they were favorable to him. We overrule this exception.

Exception 17. Defendant claims that the testimony given by D. Kaapa who was present and heard Mr. Kinney interrogate Kaio on the Wednesday after the murder, did not implicate Kaio and should have been rejected before the jury as it implicated only Kapea and he was not present at the examination. Kaio's admissions clearly implicated Kapea. But Kaapa testified that he heard Kaio say, "I did not consent to this thing being done and I opposed and forbade very strongly Kapea and Iosepa in their doing this thing." Also, on being asked how he knew that they were going to do anything serious or important Kaio said, "They told me that they were going to carry out the work they had planned." This was admissible evidence as tending to show knowledge of Kaio of the plan to kill the doctor, although it might not be sufficient to prove his aiding or abetting the crime.

Exceptions 18 to 21. The witness Paupau, called for the defense, had recited without objection and not denied by prosecution the details of a larceny committed by Iosepa of some of her bed clothing, &c. After the articles had been found and returned to her she agreed to take a sum of money from Iosepa, presumably to stop prosecution. This money was paid by Iosepa. Counsel asked her if Iosepa harbored ill feelings towards her in consequence. She said, "I suppose he felt angry with me but he did not show it very much. We all lived together after that."

The deputy sheriff, J. S. Hipa, was then introduced to show the same facts in regard to the larceny. Objections to the questions were sustained by the court. We think this was right. The larceny by Iosepa and settlement were not denied. No bias or ill will was shown to have existed in Iosepa's mind against Paupau. The evidence was not introduced to discredit Iosepa, for he did not deny the larceny. The only effect the evidence would have would be to accumulate evidence on a point not denied, from which it was supposed the jury might infer ill will or prejudice of one witness against another witness and inferentially only against defendants.

Exception 22, is to the charge of the court on the degrees of murder. The charge is set out in the bill of exceptions as follows: (1) "That the jury could not under the testimony in the case convict Kapea of any offense less than murder in the first degree; (2) that the jury could not under the testimony convict Kapea of murder in the second degree; (3) that their verdict as to Kapea should be guilty of murder in the first degree or not guilty; (4) that their verdict as to Kaio should be guilty of being an accessory before or after the fact to the offense of murder in the first degree or not guilty; (5) that the jury, if they believed that Iosepa murdered Dr. Smith with deliberate, premeditated malice aforethought and that Kapea was present, aiding, abetting or encouraging the murder, should convict said Kapea of murder in the first degree; (6) objection was also made to the court's definition of the offense of manslaughter." The judge charged on this point in the following language:

"If you believe from the evidence that the witness Iokepa and the defendant Kapea went to the house of Doctor Jared K. Smith on the day named in the indictment and that defendant Kapea then and there shot and killed Doctor Smith with deliberate premeditated malice aforethought, without authority, justification or extenuation by law; or, if you believe that Doctor Smith was so killed by Iokepa and that Kapea was present and aided, incited, countenanced or encouraged the

murderer in the commission of the offense, then, and in either case, you will find the defendant Kapea guilty of murder in the first degree.

"In order to convict Kapea you must be satisfied from the evidence that the prosecution has proved his guilt beyond a reasonable doubt, and you must have an abiding conviction that he is the person who fired the fatal shot, or that he was present aiding, abetting or encouraging the murderer.

"If you believe the evidence of the witnesses Johnny and Iokepa to be true as to how Kapea, impelled by feelings of ill will or resentment against the doctor, planned beforehand the killing of the doctor, and as to how he lay in wait for the doctor for the purpose of killing him on one or more nights of that week before the Friday night, and as to how on the Friday night he went to the doctor's house for the same purpose, and as to how he lay in wait for him on that night and shot him, then that constitutes a killing with deliberate premeditated malice aforethought within the meaning of the law, and you must find Kapea guilty of murder in the first degree. But if you believe from the evidence that at the time of the alleged killing Kapea was in fact at Paupau's house and not at the doctor's, or if the evidence does not prove beyond a reasonable doubt that it was Kapea who fired the fatal shot, or that Iokepa fired the fatal shot and that Kapea was present and aided, incited, countenanced or encouraged him in the commission of the crime, then you must find Kapea not guilty."

This is one of the most important points in the case and has never before been decided in this country. The present statute of murder was enacted in 1890, and is in part as follows: Penal Laws pp. 62-3.

37. Murder is the killing of any human being with malice aforethought, without authority, justification or extenuation by law, and is of two degrees, the first and second, which shall be found by the jury.

38. When the act of killing another is proved, malice afore-

thought shall be presumed, and the burden shall rest upon the party who committed the killing to show that it did not exist, or a legal justification or extenuation therefor.

39. Murder committed with deliberate premeditated malice aforethought, or in the commission of or attempt to commit any crime punishable with death, or committed with extreme atrocity or cruelty is murder in the first degree.

40. Murder not appearing to be in the first degree is murder in the second degree.

41. Whoever is guilty of murder in the first degree shall suffer the punishment of death.

42. Whoever is guilty of murder in the second degree shall be punished by imprisonment at hard labor for life or for a term of years not less than twenty, in the discretion of the court.

44. Whoever kills a human being without malice aforethought, and without authority, justification or extenuation by law, is guilty of the offense of manslaughter.

45. Manslaughter is of three degrees, and the jury under an indictment for murder or manslaughter may return a verdict of manslaughter in either degree, or of assault and battery, as the facts proved will warrant.

Counsel for defendant contend that as the statute makes it the province of the jury to find the degree of murder, the court invaded their province by charging as it did. But the jury was bound to take the law from the court. The much debated subject whether the jury are the judges of the law as well as of the facts in criminal cases is settled in this country by Sec. 4 of the Act to Reorganize the Judiciary (Chap. 57, Laws 1892), which reads: "All questions of law arising in any cause shall be decided by the court or judge before whom the matter is pending; and the instructions of such court or judge in relation to the law shall be binding upon the jury, if any be empanelled in the cause." Murder in the first degree differs from murder in the second degree, in that in the first degree the

murder must be committed with deliberate premeditated malice, &c. There was evidence that the murder was deliberate and premeditated; and there was absolutely no evidence that the killing was done in any manner to make the deed an offense of a lesser degree. The court, though prohibited by statute to comment upon the sufficiency or the weight of evidence, is allowed to charge whether there is or is not any evidence on any point (Sec. 1, Chap. 56, Laws 1892). It will be seen that the judge did not question the right of the jury to decide whether the witnesses were to be believed or not. But if they believed the facts to be as testified to by the witnesses the facts constituted the offense of murder in the first degree and none other. The jury were by law bound to observe the law as laid down by the court and to apply it to the facts which they might find were proved. To charge as Judge Perry did, that such facts if proved, constituted murder in the first degree and then to say to the jury that it was within their power to declare by their verdict that the facts found by them constituted a lesser offense, would be in effect to tell them that they might find the law to be what the court had found was not the law. This would be conceding to the jury a right that the law does not give them. The jury are not authorized to render a verdict not supported by the facts and the law. If this were otherwise, and if the jury were authorized to render a verdict which accorded with their view of the law and contrary to the law as laid down by the court, it would be difficult to find a legal ground upon which to set aside a verdict of conviction as contrary to law.

We follow and adopt the opinion of the Supreme Court, per Harlan, J., in the case of *Sparf & Hansen v. United States,* 156 U. S. 51 (1895). There it was held that "on a trial in a court of the United States of a person accused of committing the crime of murder, if there be no evidence upon which the jury can properly find the defendant guilty of an offense included in or less than the one charged, it is not error to instruct

them that they cannot return a verdict of guilty of manslaughter, or of any offense less than the one charged; and, in such case, if the defendant was not guilty of the offense charged it is the duty of the jury to return a verdict of not guilty." Two of the Justices dissented, it being their view that in the Federal Courts the jury were the judges of both law and fact. The same court in *Davis v. United States*, 165 U. S. 373 (1897), per Brewer, J., held, affirming the case of *Sparf & Hansen v. United States*, as follows: "The last instruction asked was in reference to manslaughter. But under the evidence there was no occasion for any statement of the law on this. There was no testimony to reduce the offense, if any there was, below the grade of murder. If the defendant was sane and responsible for his actions there was nothing upon which any suggestion of any inferior degree of manslaughter could be made," &c.

In a case decided by the same court at a date between *Sparf & Hansen* and *Davis*, the court held to the same law but ordered a new trial because they found evidence relevant to the issue of manslaughter and said that so long as there was some evidence of manslaughter though the evidence that it was murder and not manslaughter was in the opinion of the court simply overwhelming, the credibility and force of the evidence was for the jury and was not matter of law for the decision of the court. *Stevenson v. United States*, 162 U. S. 313 (1896). The Supreme Court of the United States cite in *Sparf & Hansen* many decisions of state courts to sustain the authority to charge as the circuit judge did in the case before us. We refer to them.

*People v. Barry*, 90 Cal. 41;
*People v. McNutt*, 93 Cal. 658;
*Clark v. Commonwealth*, 123 Penn. St. 81;
*State v. Lane*, 64 Mo. 319, 324;
*State v. Kilgore*, 70 Mo. 546;
*McCoy v. State*, 27 Tex. App. 415.

There are cases of the contrary, from Ohio, North Carolina and some other states.

Counsel for the defense cited on his side *Hopt v. Utah*, 110 U.
S. 574 (1884). But here the conviction for murder was set
aside because the judge had in charging the jury said that the
murder by whomsoever committed was "atrocious and dastardly,"
and by the statute of Utah "the court must not charge the
jury in respect to matters of fact," and this expression was a
comment on the facts. Counsel also say that the case of *Sparf
& Hansen* is not applicable here because there the question was
between murder and manslaughter there being no degrees of
murder in the U. S. statutes. But we think the principle is the
same, both murder in the second degree and manslaughter being
homicides of a lesser degree of enormity than murder in the
first degree. We do not see any difference between saying that
the jury must find the *degree* of murder and saying that the
jury may under an indictment for murder or manslaughter ren-
der a verdict of manslaughter of either of three degrees, "as
the facts proved will warrant."

We therefore overrule this exception.

Subdivision 5 of exception 22. Here counsel for defense ob-
ject to the court's charge that the jury, if they believed that
Iosepa murdered Dr. Smith with deliberate premeditated malice
aforethought, &c., and that Kapea was present aiding, abetting
or encouraging the murder, should convict Kapea of murder in
the first degree. The language of the court is given above. This
is objected to as being inapplicable to the case, though stating
the law correctly. A careful review of the evidence shows that
though Kapea's defense was an alibi, he testifying that he
stayed at Paupau's house on that Friday evening, he gave
some testimony to the effect that Iosepa and Johnny left the
house that night but where they went he did not know and
they did not return until shortly before the officers came there;
and gave also some testimony tending to show that the pistol
which was used in the murder was Iosepa's and not his and that
Iosepa and not he hid it in the stonewall.

Though the defense did not urge upon the jury the theory
that Iosepa did the killing there was enough in the case to make

it not improper for the court to charge that if the jury believed that Iosepa did the killing, if Kapea was present aiding and abetting Iosepa he was equally guilty.

Exception 23 was not pressed.

Exception 24 is to the court's refusal to grant a new trial on the ground that the verdict was contrary to the evidence, &c., already considered.

Exception 25. It appears by affidavit that the verdict in this case was not returned into court until 2:45 o'clock p. m. of November 26th last, which was the last day but one of the term. T..e statute, Sec. 685, page 250 of the Penal Laws (Ed. 1897) prescribes that in all cases where the law awards the punishment of death, there shall always intervene at least forty-eight hours between the conviction and the sentence. There did not remain forty-eight hours of the term. Counsel for prosecution, Deputy Attorney-General Kinney, thereupon moved the court to suspend the rendition of sentence until the next term of the court which motion was granted and sentence was not pronounced until the next term.

Exception 26 is to the course pursued, and counsel for defense maintain that as there was not remaining forty-eight hours between verdict and the legal termination of the term a mis-trial resulted. We think the court followed the proper course. To have sentenced these defendants to death within forty-eight hours of their conviction would be a violation of a statute enacted for the purposes of mercy and of which they could well complain. We held in a late case *Republic v. Pedro,* 11 Haw., that a court of record having stated terms has the power to suspend the rendition of sentence for good cause to a definite time, be the same to the next or to a succeeding term, and we see no reason to change our opinion.

The exceptions are overruled.

On a careful examination of all the evidence and papers in the case we find that the defendants had a fair and impartial trial and every reasonable opportunity afforded them for their

defense and the law which has been violated must take its course.

Exceptions overruled.

*W. A. Kinney, Dep. Atty. Gen'l,* for prosecution.

*A. G. M. Robertson* for Kapea and Kaio.

*A. Rosa* for Upapa.