TERRITORY *v.* YUTAKA FUKUNAGA, ALSO KNOWN AS MYLES YUTAKA FUKUNAGA, ALSO KNOWN AS MYLES FUKUNAGA.

No. 1860.

SUBMITTED DECEMBER 27, 1928.          DECIDED JANUARY 3, 1929.

PERRY, C. J., BANKS AND PARSONS, JJ.

698

OPINION OF THE COURT BY PERRY, C. J.

The plaintiff in error was tried before a jury under an indictment charging the crime of murder in the first degree, was convicted and was sentenced to death. By a writ of error he seeks to review the proceedings had in the trial court. The errors assigned will be dealt with seriatim.

The first assignment is that the trial judge erred in refusing to sustain the defendant's challenge of Otto Meyer, a proposed juror, for cause. In support of this assignment it is urged that the juror "had an abiding opinion that one who killed another, 'irrespective of anything else', should suffer the death penalty"; and second, "that said juror being deputized had actively participated in the search of the slayer of George Gill Jamieson," who, it was alleged in the indictment, was murdered by the defendant. After the court had overruled the challenge for cause Meyer was challenged peremptorily by the defendant and was excused by the court. He did not sit as a member of the trial jury. This in itself is a sufficient answer to the assignment. If there was any error in the denial of the challenge for cause it was not

prejudicial. Meyer, not having sat as a juror, contributed nothing to the discussions · or the decision of the jury ·and any prejudice or disqualification on his part could not possibly have had any detrimental effect upon the defendant's rights. However, the defendant being under sentence of death, we prefer in this and other instances of a similar nature following to consider whether the ruling denying the challenge for cause was in fact erroneous.

The juror said that he had an opinion as to the guilt or innocence of the defendant but that he could nevertheless try the case fairly and impartially upon the law and the evidence. He said that he could take the law as given by the court and the evidence as he should hear it from the witnesses in court. He had read the newspapers but his mind had not been inflamed. "It has to be proved to me before the court", he said, meaning that the offense would have to be proved before he could find the defendant guilty. He also said that at the time of the commission of the offense he "would like to get his hands on the homicider and strangle him" but that at the time of the trial he had no such thoughts. He said that he believed in the law of "a life for a life" and that "irrespective of anything else, if one man kills another the man doing the killing or committing the murder should die." The court explained to all the prospective jurors present that it would be their duty to "come to a conclusion which will be based solely upon the evidence given in court under oath and so far as the law of the case is concerned that you will follow the law as given you by the court." The juror said that after listening to the instructions of the court as to the distinction between murder in the first degree and murder in the second degree he could follow those instructions and apply them to the evidence adduced.

It frequently happens in examination of jurors on their voir dire that the earlier answers are given in the light of erroneous views of the law and that when those views are corrected by the court the juror is perfectly able to adopt the court's statement of the law and to render an honest verdict in accordance therewith. So, in this instance, although the earlier answers of Meyer might indicate that he believed in the punishment of death for all homicides, still when the court instructed him as to the distinction between murder in the first degree and murder in the second degree he felt entirely able to acquiesce in those distinctions and to regard the evidence with that state of the law in mind. The opinion with which he entered the jury box was one which upon his statement could be easily laid aside.

It appeared from Meyer's answers that he had been appointed a deputy sheriff to aid in the search for the slayer. His only activities under that commission, however, were that he patrolled Young Street during one night and that he guarded mail boxes on another day. He did not find the defendant or take any part in arresting him. Under these circumstances there is no disqualification. "A person holding a commission as a special constable, unpaid, is not thereby disqualified from sitting as a juror on a criminal trial." *King* v. *Loomens*, 8 Haw. 10, 11. It was the duty of every able-bodied citizen to take part in the search for the murderer in such a case, whether the killing was by a person who was insane or by one who was sane. The horror and the indignation which Meyer and other prospective jurors felt were directed at the crime and not at this defendant. There was nothing in the examination to suggest prejudice on his part against the defendant.

The second error assigned is that the court did not excuse George H. Swift from duty as a juror; but

Swift was not challenged for cause. If the defendant saw any reason for doubting the qualifications of this proposed juror he should have stated it at the time and thus permitted opposing counsel and the court to further investigate the alleged disqualification. A defendant in a criminal case cannot sit in silence and accept a juror as unprejudiced and fair and then subsequently allege error in the retention of the same juror. As in the case of Meyer, however, no cause for challenge appeared. He had formed no opinion. He had served as a guard at Waikiki near the body of the decedent shortly after it was found but he did not see the body. He did not search for the murderer because he "had no clues".

The mere fact that he served as a guard after the body was found does not indicate any prejudice on his part against the defendant or any inability to weigh the evidence against him and that in his behalf.

The next assignment is that the court erred "in passing" William Lewis Thoene "for cause when it affirmatively appeared that said juror had actively participated in the search for the slayer". But the court was not asked to rule on the matter and did not rule. There was no challenge for cause. The juror was challenged peremptorily by the defendant, was excused and did not sit as a member of the jury. Both of these are sufficient reasons for holding that there was no error with respect to this proposed juror. Moreover, there was in fact no legal cause for challenge. The juror had no opinion with reference to the merits of the case. He went out one afternoon with one Ross to the vicinity of the McKinley High School, presumably to search for the body or possibly the slayer, but did not find either. He did not in any wise come in contact with the defendant. Within the ruling above there was no disqualification.

The fourth assignment is that the court denied the defendant's challenge of Victor Hurd for cause. This juror had had an opinion but said at the beginning of his examination that he could remove it immediately without any evidence and proceed to consider the case purely upon the law and the evidence submitted before the jury. He was one of fifty employees sent by a large firm of this city to the armory to aid the sheriff's department. He was made a deputy sheriff and was sent to Puuloa Junction, presumably to aid in the search. His search was not successful. He did not come in contact with this defendant. The challenge was correctly denied.

The fifth assignment is that the trial judge erred in allowing the Territory to peremptorily challenge Ernest N. Parker after the Territory had twice waived its right to peremptorily challenge, this juror being in the jury box at the time of each of the two waivers. It is unnecessary for us to decide whether this was in reality an error in procedure. It may be assumed that it was, for the defendant was not prejudiced thereby. When the defendant finally accepted the jury as satisfactory, he had four peremptory challenges remaining unused, thus showing conclusively that the erroneous exclusion of Mr. Parker had not resulted in placing upon the jury a disqualified and objectionable juror. As said by the Supreme Court of the United States (see quotation below), a defendant's "right to challenge is the right to reject, not to select". He had no right to the services of Mr. Parker or any other one juror in particular, provided only that the jury when finally selected and sworn was composed of duly qualified lawful jurors. One good and lawful juror is just as good in the eyes of the law as another good and lawful juror. "Where a cause has been tried by an impartial jury,

although the judge, on the application of one of the parties and against the consent of the other, may have rejected a juror for a cause of questionable sufficiency, such rejection does not afford a ground of complaint, if justice has been done in the premises. In other words, while the disallowance of a cause of challenge will work a reversal of the judgment, an improper allowance of a cause of challenge will not necessarily have this effect. A qualified juror may be rejected, and still a jury of lawful men against whom there is no objection may be obtained." *Republic* v. *Kapea*, 11 Haw. 293, 302.

In *Hayes* v. *Missouri*, 120 U. S. 68, 71, in which complaint was made that too many challenges were allowed to the prosecution, the court said: "To that end it may be a wise proceeding on the part of the legislature to enlarge the number of peremptory challenges in criminal cases tried in those cities. The accused cannot complain if he is still tried by an impartial jury. He can demand nothing more. * * * The right to challenge is the right to reject, not to select, a juror. If from those who remain an impartial jury is obtained, the constitutional right of the accused is maintained. In this case it is not even suggested that the jury by which the accused was tried was not a competent and impartial one. He was allowed twenty peremptory challenges, and it does not appear that he exhausted them."

"But if we regard the challenge as for cause, its allowance did not prejudice the company. A competent and unbiased juror was selected and sworn, and the company had, therefore, a trial by an impartial jury, which was all it could demand." *Northern Pacific R. R. Co.* v *Herbert*, 116 U. S. 642, 646.

"It is not substantial error for the district court to discharge a juror during the time the jury are being impaneled although the juror may be discharged for

an insufficient reason, where an unexceptionable jury is afterwards obtained, and where the party complaining has not exhausted his peremptory challenges." *Railroad* v. *Franklin*, 23 Kan. 49, 52.

"Even if a juror had been set aside by the court, for an insufficient cause, I do not know that it is matter of error, if the trial has been by a jury duly sworn and impaneled, and above all exceptions. Neither the prisoner nor the government in such a case have suffered any injury." Story, J., in *United States* v. *Cornell*, 2 Mason 91, 106.

The sixth assignment was to the overruling of defendant's challenge of William K. Kahilikolo for cause. While the challenge was denied, the juror was subsequently challenged peremptorily by defendant, was excused and did not serve on the jury. This alone shows that the error, if any, in denying the challenge for cause, was not prejudicial. He did at one time in his examination say that "if the sole proof is that this young man" (meaning the defendant) "killed him, I will convict him of murder in the first degree irrespective of anything else", and also that he would not determine a person to be insane except upon the testimony of doctors. Subsequently, however, after receiving instructions upon the law from the court, he amply showed that he was able and willing to obey instructions concerning the two degrees of murder and also to heed evidence of insanity coming from non-experts if instructed by the court so to do. Answers given by jurors upon erroneous theories of the law, subsequently corrected by the presiding judge, cannot be properly regarded as indicating bias or prejudice or incompetency.

Of these six jurors thus far considered two only actually sat as members of the jury. An additional reason why the error, if there had been any, as there was not, in the

rulings concerning their qualifications, could not now avail the defendant is that when the jury was sworn he had remaining unused the right to four peremptory challenges. The failure to use them constitutes a waiver of any possible error in the rulings and indicates satisfaction with the jury as it was constituted. "An erroneous overruling of an objection to a juror avails nothing to the defendant, if he does not finally exhaust his peremptory challenges." *Queen* v. *Leong Man,* 8 Haw. 339, 340, followed in *Provisional Government* v. *Caccires,* 9 Haw. 522, 540 and reaffirmed in *Republic* v. *Kapea,* 11 Haw. 293, 301. "If at the conclusion of the examinations the challenges of the defendants were not exhausted they cannot complain." *Republic* v. *Kapea,* 11 Haw. 293, 301.

During the course of the examination of the proposed juror Kahilikolo the following proceedings were had: "Mr. Davis: Q. And if the court instructs you it is not necessary to produce doctors to prove a person is insane, you will follow that instruction? A. I will follow that instruction. Q. If the court instructs you a man is insane from testimony of his parents or relatives, although not doctors,—if you are satisfied with their testimony you will follow the instructions of the court? A. Yes. The court: Objection overruled. Mr. Beebe: Exception. Questions by Mr. Beebe: Q. Are those the only people's testimony you would accept to show insanity? Must somebody come before you and testify that this boy is insane before you vote he is insane? A. Yes. Mr. Beebe: Renew my challenge. The court: Challenge denied. Q. If from the boy's own testimony the question should arise as to whether or not he is sane or insane, would you then say he was sane? A. I don't think so, if he said he was insane. Q. You would not take that from him? A. No. Mr. Beebe: I again renew my challenge. The court: The question is purely hypothetical. It is

entirely probable you don't understand this phase of the matter, and it is perfectly natural you should not. The real question which you have to answer is whether or not if the court should give you instructions on insanity and what constitutes a defense for insanity,—whether or not you will listen to evidence, whether it comes from the defendant himself or from anyone else, and take all the evidence into consideration on that point and other points in the case and try to determine where the truth is of that matter, and reach a conclusion to the very best of your judgment. Will you do that? A. Yes. The court: And if you believe that what the defendant says on that point, if he should be a witness, is true, you will believe him, will you? A. Yes. The court: And you will listen to his testimony if he becomes a witness with an open mind on the phase of insanity, as well as to every other phase, will you do that? A. Yes. Mr. Beebe: May I suggest the witness be not led. The court: The court is trying to instruct the juror. Mr. Beebe: My position is this,—I should like to know what the juror thinks. The court: The juror first has to be instructed on what the law is. You may proceed with your examination; questions to jurors, without having the background of what the law is, cannot obtain very truthful results. Q. Assume that the boy did not say if he went on the witness stand, whether he was sane or insane, but the question should occur to your mind whether he was sane or insane, would you let your conscience be your guide, or say 'hang', irrespective of anything else? Mr. Davis: Objected to as incompetent, irrelevant and immaterial and not based on any question of law or fact or supposition. (Question read by the reporter) (Argument) Mr. Beebe: I submit the question is a fair and proper question, and a question the jury must determine. Mr. Davis: I would have no objection to the question if counsel says from all the

evidence, facts and circumstances in the case a doubt as to the defendant's sanity arises in your mind, what are you going to do about it, or something of that kind. The court: The objection to that question in that form will be sustained. Mr. Beebe: Exception."

The seventh assignment is that the court erred in sustaining the Territory's objection to the defendant's question above quoted beginning with the words "assume that the boy did not say." and also erred "in asking leading questions" (eighth assignment), the so-called leading questions being the statement by the court above quoted beginning with the words "the question is purely hypothetical" and the two questions by the court immediately following. There was no error in these respects. It was entirely proper for the court to explain the law on the subject of insanity and the evidence thereof to a prospective juror who was not familiar with it and who could not in any event enforce his own views, if he had any, against those of the court. The trial judge would have been lacking in his duty if he had not, under the circumstances, enlightened the jurors on the law before permitting the examination to proceed. Erroneous views of the duty of a juror could well follow and would almost necessarily follow from prior misconceptions of the law. There is no merit in the objection that the questions were leading.

The question referred to in the seventh assignment, beginning with the words "assume that the boy did not say", was correctly disallowed. It operated unfairly to the juror to confine him to the two alternatives presented, "would you let your conscience be your guide or say 'hang' irrespective of anything else?" It should have permitted him the third alternative of saying whether he would have considered all the evidence in the case on the subject of insanity and would have followed the law applicable thereto as laid down by the court. A sugges-

tion made at the time by counsel for the Territory that the question be put in an amended form so as to obviate this objection was not accepted by the defendant. It is also true, with reference to these two assignments, the seventh and the eighth, that Kahilikolo was challenged peremptorily, was excused and did not sit as a member of the jury and that if there had been any error in his examination, as there was not, the error was entirely cured by the fact that he did not become a member of the jury and could not possibly have contributed by ignorance or prejudice or in any other way to the verdict rendered.

The ninth assignment is that the verdict "was contrary to law, the evidence and the weight of the evidence; * * * was illegal and erroneous; * * * and was a nullity." Under this assignment no contention is advanced that the evidence adduced was insufficient to support a conviction of murder in the first degree,—although this subject will be referred to briefly hereinafter. The only argument advanced is as follows: "That practically every one of the twelve jurors sitting on the jury had either expressed or entertained an opinion as to the guilt or innocence of the defendant was revealed from the voir dire examination of the jurors. The jury as finally constituted should have included Ernest N. Parker erroneously excused by the Territory with the approval of the court and over the objection of defendant. Victor Hurd should have been excused for cause as well as others who remained on the final panel. The jury that tried said cause being illegally constituted, the verdict rendered by said jury was a nullity." In support of this ninth assignment the attitude of mind of the following jurors is adversely commented upon in the appellant's brief:

(a) Otto Meyer. All of the questions relating to him have been ruled upon above.

(b) Wallace E. Saffery. What he read in the news-

papers "naturally left an impression" on his mind, but at the time of the examination he had no opinion concerning the guilt or innocence of the defendant and felt able to lay aside his impressions and weigh the evidence, take the law from the court and give the defendant a fair trial. After a lengthy examination by both sides he was not challenged for cause. Evidently the defendant was satisfied to have the juror sit in judgment over him.

(c) Nelson R. N. Robinson. The claim in the brief is that this juror "stated that he had read and heard about the case", but he added "I find from my experience as a juror the papers did not bring out all the facts" and that he would be willing to lay aside what he had read. He was not challenged for cause.

(d) Gordon C. Ross. He was sworn in as a special deputy, had a part in several conferences with the sheriff and "knew the facts of the case pretty much as they were developed." He was challenged for cause and the court sustained the challenge and excused the juror.

(e) John H. Tyler. He had at one time formed an opinion but did not hold it at the time of the examination. At first he was incensed at the crime and "had a feeling of revenge", but after the arrest his attitude changed in some degree "to one of sympathy". The juror was not challenged for cause, but was later challenged peremptorily by the defendant and did not sit.

(f) George H. Swift. Disposed of above.

(g) Ernest N. Parker. Disposed of above.

(h) Eugene Tsun Choy Yap. Not challenged for cause, but peremptorily challenged by the defendant; and did not sit.

(i) James Y. Wong. Challenged for cause by the defendant and challenge sustained. Did not sit.

(j) Edward Mahaulu. Challenged for cause by the defendant and challenge sustained. Did not sit.

(k) Edward Kam. Challenged for cause by the prosecution and challenge sustained. Did not sit.

(l) E. K. Lazarus. Challenged for cause by the prosecution and challenge sustained. Did not sit.

(m) R. W. Cain. Not challenged for cause. Challenged peremptorily by the defendant. Did not sit.

(n) Charles Young. Challenged for cause by the defendant and challenge sustained. Did not sit.

(o) Hung Lun Lum. Challenged for cause by the defendant and challenge sustained. Did not sit.

(p) W. L. Thoene. Disposed of above.

(q) H. P. Agee. This juror "had a feeling of indignation" when the crime was committed but after the arrest concluded that the defendant should have a fair trial. He evidently satisfied the defendant of his fairness for he was not challenged, either for cause or peremptorily.

(r) J. P. Waipa. He had an opinion which he could not set aside and was unable to give the defendant a fair trial. He was excused by the court without challenge; and did not sit.

(s) Verne Hinkley. This juror had a fixed opinion and was excused by the court without challenge. He did not sit.

(t) Victor Hurd. Disposed of above.

(u) Alan C. Wilcox. Was not challenged for cause but was challenged peremptorily by the defendant, was excused and did not sit.

(v) H. A. K. Burgess. He expressed himself rather violently "at the time" but "changed his opinion" since the capture and at the time of the examination felt sympathy for the defendant. He was not challenged for cause or at all.

(w) G. D. Holt. Had a fixed opinion, was excused by the court without challenge and did not sit.

(x) R. K. L. Fuller. This juror said that at the time

of the commission of the offense he had formed and expressed an opinion but that it was "not very fixed" and that the opinion was changed "when the boy was captured"; that he had no opinion at the time of the examination as to the guilt or the innocence of the defendant and was "perfectly neutral". Evidently he proved satisfactory to the defendant, for he was not challenged and sat as a juror.

(y) S. T. Hill. Challenged for cause by the prosecution and challenge sustained. He did not sit.

(z) W. K. Kahilikolo. Disposed of above.

(a-2) L. M. MacComiskey. This juror had an opinion which he believed he could set aside. He felt he could try the case on the law and the evidence. He evidently proved satisfactory to the defendant and was not challenged.

(a-3) T. A. Mossman. Was challenged for cause by the defendant and the challenge was sustained. He did not sit.

(a-4) B. A. Hoke. Was challenged for cause by the prosecution and the challenge was sustained; he did not sit.

(a-5) M. A. Hood. Was not challenged for cause but was challenged peremptorily by the defendant, was excused and did not sit.

(a-6) Ruel Kinney. Was not challenged for cause, was challenged peremptorily by the prosecution, was excused and did not sit.

(a-7) S. Maruyama. In pursuance of his employment this juror wrote one or more statements concerning the kidnapping and the homicide for a newspaper published in this city, but had formed no definite opinion and understood that at the trial the defendant was to be presumed to be innocent until and unless proven guilty. He was evidently satisfactory to the defendant for he was not challenged.

(a-8) A. F. Wall. Had formed an opinion but not a fixed one and it would not influence him in deciding the case. He would be guided by the evidence as presented before the court and by the law as laid down by the presiding judge. He had offered his services to the city and county attorney and had placed his automobile and driver at the attorney's disposal, but was not required to serve and did not participate in the search. He was not challenged.

(a-9) T. J. Lewis. Challenged for cause by the prosecution and challenge sustained. He did not sit.

(a-10) E. Pung. Challenged for cause by the prosecution and challenge sustained. He did not sit.

(a-11) G. E. Jurgensen. "At the time the thing came up" he formed an opinion, but did not entertain it at the time of the examination. He felt that he could try the case fairly and impartially, doing justice to both parties. He had expressed himself shortly after the commission of the offense to the effect that the person who perpetrated the crime "ought to get the death penalty", but the fact that he had so expressed himself would not in any way influence his verdict. He said "it would have to be proven to me that the man was sane to get the punishment * * * and that the acts that were committed were done with deliberation and premeditation and malice aforethought." He evidently was satisfactory to the defendant and was not challenged.

(a-12) A. E. Coxhead. He had had an opinion but it was not a fixed one and he believed it to be his duty to be fair and to try the case solely on the law and the evidence as adduced in court. He said, "In a matter of that kind we are all a little upset. I have settled down and used more reasoning power since, and feel that the law should take its course, and be fair and reasonable in my judgment." He was "on a graveyard party at the cemetery to

see that no harm was done to the remains" of the decedent. He evidently satisfied the defendant of his fairness and was not challenged.

The mere fact that some of the persons examined on the voir dire proved to be biased or prejudiced or to be otherwise disqualified is not ground for setting aside a verdict, provided the persons thus disqualified were all excused from service and all who did serve were good and lawful jurors. "If the prisoner was tried by lawful jurors, it is after the trial utterly unimportant what were the defects of other jurors, who were summoned and were not sworn." Story, J., in *United States* v. *Cornell*, 2 Mason 91, 104. The very purpose of such an examination is to eliminate those who are disqualified. The twelve who actually sat in this case were all carefully examined, the rulings concerning their qualifications and disqualifications were correct, as above held, and although at the conclusion of the examinations the defendant had still available to him four peremptory challenges he did not avail himself of any of them but declared himself to be satisfied with the jury as it was then constituted. If some of the jurors answered preliminarily that they had opinions of varying degrees, upon further examination it was found in every instance, in so far as the final twelve are concerned, that those opinions were not fixed, were such that they could be laid aside and would not interfere with the proper performance of duty and that in spite of the prior existence of these opinions the jurors were duly qualified. They were opinions formed without responsibility, easily laid aside when the holder was placed under the solemn duty and responsibility of saying whether or not a fellow man should suffer the punishment of death or any other punishment. We are satisfied that none of the jurors who sat in the case were disqualified; that they all appreciated the solemnity of their obligations

and were all in an attitude of mind of entire fairness, seeking only to ascertain the truth as to the facts and to apply the law as it should be stated to them by the court.

It is worthy of note that a change of venue was not requested by the defendant. He was represented by counsel of ability and experience. Evidently they did not, even after the examination of the jurors had been entered upon, consider that a fair and impartial trial could not be had in the first circuit.

Assignment number ten is as follows: "That the circuit court erred in not declaring a mistrial when it appeared from the evidence during the trial that said defendant had been and/or was being detained in the Oahu penitentiary whose inmates were and are all felons. A fair and impartial trial of said cause was manifestly impossible when said defendant was being treated as a felon prior to and during his trial. Circumstances surrounding the trial, the conduct of witnesses and utterances of Dr. Eckerdt, Dr. Faus and other witnesses and of the jurors themselves indicated that the defendant was branded with the mark of the 'guilty' before the trial had commenced." Assuming that it appeared from the evidence during the trial that the defendant was being detained in Oahu prison, that does not constitute ground for a new trial. It does not appear that any argument or inference adverse to defendant was sought by the prosecution to be drawn therefrom. Oahu prison was doubtless used in this instance as a place of detention not merely for the protection of the community against an escape, but also, and perhaps mainly, for the protection of the accused and to insure his personal safety. It cannot be presumed in this enlightened age that any intelligent jury would draw from the mere fact of the place of detention any inference of guilt against the accused. The jurors were instructed, as is customary, that they should not permit

themselves to be influenced to any extent against the defendant "because or on account of the indictment in this case". Where he was detained pending trial was an utterly immaterial matter. Other than as herein specifically referred to and disposed of, no "circumstances surrounding the trial" or "conduct of witnesses" or "utterances of witnesses or of jurors" have been called to our attention as being prejudicial, under this assignment, to the interests of defendant.

Assignment number eleven is to the imposition of sentence on the ground that it was "based upon the erroneous verdict of a jury not properly constituted", and which verdict was therefore "a nullity". This assignment is based solely upon other specifications of error which are herein treated and disposed of.

Assignment number twelve is that the court erred in entering judgment against the defendant. The claim hereunder is that "the statute on murder (Section 4115 of the Revised Laws of Hawaii, 1925) was interpreted by the circuit court as denying the defendant the right to plead guilty to the indictment which was one of murder in the first degree. The circuit court also interpreted said statute as compelling the defendant charged with murder in the first degree to be tried by a jury. Such construction makes it a mandatory statute, unconstitutional in its application in that the statute, when so interpreted and applied, as in this cause, deprived said defendant of the right to plead guilty and the right to be tried by the court and not by a jury." The argument is that the defendant had an absolute right to enter a plea of guilty. In the formal assignment of this alleged error the contention seems to be that the defendant had a right to be tried by the court and not by a jury, but in the defendant's brief the argument is that having pleaded guilty his right was to have *the jury* determine whether he was guilty of mur-

der in the first degree or of murder in the second degree.

For as long a time past as any of us can remember the practice in these islands, under the Monarchy, the Provisional Government, the Republic and the Territory, has been for trial judges to refuse to accept a plea of guilty to an indictment charging an offense punishable with death and to require the entry of a plea of not guilty and a trial by jury to determine the guilt or innocence of the accused. It is now contended, not only by the defendant but also on behalf of the Territory, that this practice was erroneous and that under our statutes the court should have accepted the plea of guilty. We find it unnecessary to pass upon the point in this case. If it be assumed that the defendant was entitled as of right to plead guilty, as he did when asked on his first appearance what his plea was, the subsequent trial should be held for naught and the judgment of conviction and the sentence of death would be supported by the plea and would be good. A plea of guilty when properly receivable is a just and legal foundation for a judgment of conviction and for a sentence authorized by statute. The contention, if it was intended to be so stated in the assignment under consideration, that upon a plea of guilty the defendant was entitled "to be tried by the court and not by a jury", is not pursued or argued in the brief (the case was submitted to us without oral argument) and is unworthy of further consideration by us. We know of no such right. So, also, the contention which is argued in the brief that upon the entry of the plea of guilty the right of the defendant was to have a jury determine the degree of his guilt,—that is, whether the offense committed by him was murder in the first degree or was murder in the second degree—cannot be sustained. In the first place, what the indictment charged against him was, both in its statement of the acts done and in its concluding characterization of the

offense, murder in the first degree. It is true that under such an indictment a conviction may be had of the crime of murder in the second degree or of manslaughter or even of assault and battery, but when the defendant simply said in answer to the question of the court as to what his plea was, "I plead guilty," what he did was to plead guilty to the charge of murder in the first degree as set forth in the indictment. He did not say in words or in effect, "I plead guilty of murder in the second degree," or "I plead guilty of manslaughter," or "I plead guilty of assault and battery." When he pleaded guilty of murder in the first degree there was nothing left to try, either as to guilt or innocence or as to the degree of the offense of which he was guilty. He had himself indicated and settled the latter by his plea. (This is always assuming that the plea was properly entered and receivable.) In the second place the jury did determine the degree of murder that he was guilty of. The question of whether he was guilty of murder in the first degree or of murder in the second degree was expressly left by the trial judge to the jury to determine. In his first instruction the judge said: "The court instructs you * * * that the defendant in this case is charged in the indictment with the crime of murder in the first degree." In the second he said: "The court instructs the jury that our statutes define murder as follows: 'Murder is the killing of any human being with malice aforethought, without authority, justification or extenuation by law and is of two degrees, the first and second, which shall be found by the jury.' " In later instructions he gave definitions of murder in the first degree and of murder in the second degree and clearly stated the elements which were essential to the one and not to the other. In instruction number twenty-six the jury was told: "Under the evidence and these instructions, you may find the defendant (1) guilty as charged; (2) not guilty as charged

but guilty of murder in the second degree; (3) not guilty because we find that the defendant was insane at the time of the commission of the offense." All of these instructions were given by agreement of both sides. They were assented to by the defendant. In them the presiding judge clearly made it known to the jury that there were two degrees of murder, what the difference was between the two and that it would be the duty of the jury to say whether the defendant was guilty of the one or of the other or not guilty by reason of insanity. In the instruction last above quoted the jury was specifically told that, in addition to the verdict of not guilty by reason of insanity, it could either find the defendant guilty of murder in the second degree or guilty as charged. The verdict was that the defendant was "guilty as charged". There can be under these circumstances no misunderstanding of the instructions or of the verdict. When the jury said that it found the defendant "guilty as charged" it said beyond all doubt that it found him guilty of murder in the first degree. The language used is utterly unambiguous. There is not even any flimsy technicality in support of the contrary view. The defendant, therefore, enjoyed the right which he now so vigorously contends for of having the jury decide whether his offense was murder in the first degree or was murder in the second degree.

But, it is said by the defendant, that if his plea of guilty had been accepted and if a plea of not guilty had not been entered for him, he would have presented a better appearance before the jury, presumably as one speaking honestly and concealing nothing, and might have received more lenient treatment in the determination of the degree of the offense. This contention is without any substantial foundation under the circumstances as they took place. While in the earlier stages of the trial the defendant allowed the prosecution to present its proof tending to show

the fact of the homicide, nevertheless he subsequently made a direct admission, through his attorneys, in open court in the presence of the jury and for the purpose of being used by the jury in its deliberations, that he had killed George Gill Jamieson. If the defendant's contention that the plea of guilty as entered was not a plea of guilty of murder in the first degree but was simply a plea of guilty of murder, still requiring a determination by the jury of the degree of the murder, is good, then his admission to the jury, made for the purpose of excluding certain incriminatory evidence (blood-stained clothing), was the substantial equivalent of the plea of guilty. He therefore did go in fact before the jury admitting that he had killed the boy and did obtain from the jury a determination of the degree of murder of which he was guilty. The complaint under this assignment cannot be sustained.

The defendant's plea of guilty and the court's direction that a plea of not guilty be entered occurred before the appointment of counsel to defend the accused. After the appointment and appearance of counsel no motion was made for the setting aside of the order entering a plea of not guilty or for leave to enter or stand by the plea of guilty. No objection was made to the production of evidence by the prosecution tending to show that it was the defendant who committed the homicide. Cross-examination of the prosecution's witnesses was had in an effort to elicit testimony in support of the theory that the defendant was insane at the time of the commission of the offense. After the Territory rested Dr. Faus, one of the witnesses who testified for the prosecution, was recalled for further cross-examination intended to effect the same purpose. The defendant asked the court, successfully, to instruct the jury on the subject of insanity. No request was made at any time that the trial be confined to the

issue concerning the degree of the offense except that, as stated above, towards the end of the trial, in order to prevent the introduction of blood-stained clothing, the defendant admitted the commission of the homicide. Under these circumstances the defendant must be deemed to have acquiesced in the court's view that "under the law" it was "not permitted to receive a plea of guilty under this indictment" and that it would "therefore be necessary for the court to direct that a plea of not guilty be entered and that a trial be had hereon". Acceptance, without objection, of the benefit of a trial permitting a verdict of not guilty on the ground of insanity (as well as consideration of the question of the degree of the offense) operated as a waiver of the irregularity, if any there was, in directing the entry of a plea of not guilty.

If the defendant's plea of guilty had been accepted, nothing would have been left for the court to do but to impose the sentence of death. As it was, the defendant enjoyed a full trial, with the legal possibilities (a) of obtaining a verdict of murder in the second degree, thereby saving his life, and (b) of obtaining a verdict of entire acquittal on the ground of insanity. The error, if any, in not accepting his plea of guilty and in entering for him a plea of not guilty was altogether in his favor and not prejudicial to him.

Another contention of the defendant is that the trial judge erred in not stating to the jury that it could find the defendant not guilty, even if he was sane at the date of the alleged offense. In other words, the contention is that, assuming that the jury found the defendant to be sane at the time of the commission of the homicide, it could, upon the evidence, find him not guilty. The defendant, as above noted, admitted to the jury that he had killed the boy named in the indictment. There is no question as to this admission being voluntarily made.

It was made in open court, during the trial, upon the advice of counsel, voluntarily, and for a purpose deemed important by counsel, to-wit, the exclusion of the blood-stained garments, which, it was claimed, might have inflamed the minds of the jurors against the defendant. Our statute, section 4116, provides that "when the act of killing another is proved, malice aforethought shall be presumed and the burden shall rest upon the party who committed the killing to show that it did not exist or a legal justification or extenuation therefor." Upon the proof, therefore, of the fact of the killing, by the defendant's admission, as above stated, it was the duty of the jury and of the court to presume malice aforethought and the burden rested upon the defendant to show that malice did not exist or a legal justification or extenuation therefor. There was no effort to do so. No evidence was adduced on behalf of the defendant tending to show or claiming any justification or extenuation for the killing. No evidence was adduced on his behalf to show that the killing was without malice. None of the evidence adduced by the prosecution permitted of the view that it was without malice or that there was any justification or extenuation therefor. An instruction that the defendant could be found not guilty would have been grossly erroneous. A verdict of not guilty (aside always, of course, from the question of insanity) was out of the question. It was legally impossible. If rendered, it would have been a perversion of justice. It was upon the theory that there was no room for a verdict of not guilty (except upon the ground of insanity) that the prosecution, the defendant and the trial court proceeded in the preparation and determination of the instructions to be given to the jury. Not only was there no request by the defendant for an instruction that the defendant, if sane, could be found not guilty, but the instruction as given, which was as-

sented to by the defendant, that the jury could merely find him guilty of murder in the first degree or of murder in the second degree or not guilty by reason of insanity, precluded the theory and the possibility of an unconditional verdict of not guilty. Under these circumstances the defendant cannot now complain of the failure to give the instruction which he now says should have been given or of the giving of the instruction limiting the verdict to one of the three possibilities named. It is expressly provided by statute in this jurisdiction that "instructions given without objection at the time of settlement to the giving thereof shall be marked 'given by agreement' and no exception thereto shall be allowed." R. L. 1925, section 2340, as amended by L. 1927, Act 184; and R. L. 1925, section 2524, provides that "no error going to * * * the giving of or refusing to give an instruction to the jury shall be considered by the supreme court unless the same was made the subject of an exception noted at the time the alleged error was committed."

Another contention advanced on behalf of the defendant is that he had a constitutional right to meet the witnesses against him face to face and that that right was violated when by consent of his attorneys it was stipulated that four certain witnesses who were named would, if called, testify to certain facts set forth in the stipulation. As we read the record there was no such stipulation as to one of the witnesses named, to-wit, the florist who sold certain flowers to the defendant. The stipulation in that instance was that the fact was that the defendant, shortly before the time set for the funeral, sent flowers purchased from the florist, together with a card of sympathy, to the home of the parents whose son he had killed. However that may be, it is immaterial whether three or four witnesses were named in the stipulation complained of. "A defendant can waive his constitutional

right to be confronted with the witnesses and other constitutional rights even in a capital case." *Territory* v. *Goto,* 27 Haw. 65, 73. This is also the view of the Supreme Court of the United States. In *Diaz* v. *United States,* 223 U. S. 442, 450, 452, referring to the fact that certain evidence "came from witnesses who were not present at the trial," the court said: "It is to be observed that the right of confrontation secured by the Philippine Civil Government Act is in the nature of a privilege extended to the accused, rather than a restriction upon him * * * and that he is free to assert it or waive it, as to him may seem advantageous." It continued: "That this is so is a necessary conclusion from the adjudged cases relating to the like right secured by the constitutions of the several states and the Constitution of the United States." It quoted with approval from the decision of Judge Cooley in *People* v. *Murray,* 52 Mich. 288, as follows: " 'A chief ground of error relied upon is that the prosecution was allowed to put in evidence certain depositions taken out of court of witnesses not present at the trial. The facts seem to be that the attorneys for the respective parties stipulated to put in certain depositions on both sides, and they were put in accordingly. This, it is said, was in violation of the respondent's constitutional right to be confronted with his witnesses. But the court made no ruling in the matter; what was done was voluntarily done by the parties; the defendant had the benefit of the stipulation, and, for aught we can know, it may have been made chiefly in his interest. * * * The defendant undoubtedly had a constitutional right to be confronted with his witnesses. He waived that right in this case, apparently for his own supposed advantage and to obtain evidence on his own behalf. It would have been a mere impertinence for the court to have interfered and precluded this stipulation being acted upon. But it would have been more

than an impertinence; it would have been gross error. And it would be palpable usurpation of power for us now to set aside a judgment for a neglect of the court not at the time complained of, but in respect to something where any other course would have been plain error. Under the view taken by the respondent it would seem that when the evidence had been obtained under his stipulation, the court was put in position where it was impossible to avoid error; for if the evidence was received, he might complain, as he does now, that his constitutional right was violated, and if the court refused to receive it when he was consenting, the respondent would be entitled to have the conviction set aside for that error.' The view that this right may be waived also was recognized by this court in *Reynolds* v. *United States,* 98 U. S. 145, 158, where testimony given on a first trial was held admissible on a second, even against a timely objection, because the witness was absent by the wrongful act of the accused." These authorities sufficiently dispose of this point.

The defendant further contends (sixteenth assignment) that it was error to receive a confession made by him to representatives of the county attorney's department and others. Our statute provides that: "No confession shall be received in evidence unless it shall first be made to appear to the judge before whom the case is being tried that such confession was in fact voluntarily made and such voluntary confession when offered in evidence on any trial shall not be rejected on the ground that it purports to have been made on oath, if proof can be given to the judge that in fact it was not so made." R. L. 1925, section 2630, as amended by L. 1927, Act 204. The confession in this instance was not on oath. Before its admission evidence was adduced by the prosecution which clearly showed, prima facie at least, that it was made

voluntarily. Mr. Brooks, deputy city and county attorney, who was present at the making of the confession, testified as follows: "I was in the room when Fukunaga was brought in and he sat down, and I think I was the first one. who spoke to him. I said, 'Hello, Fukunaga!' He said, 'Hello' and then I think Mr. McIntosh came in. I think Mr. Jarrett came in and I think Miss Mossman and you came in. Before he was questioned, if I remember correctly, he said, 'I was going to give myself up anyway. I knew it was all up because I couldn't spend the money after the list had been published,' or something of that sort. Then I said, 'Where is the money' and he said, 'It is up in my room, number 4, in the Serene Hotel'. Then I said, 'Do you object to someone going up and getting it' and he said 'No, it is under my bed, here is the key', and he gave the key to Mr. McIntosh and Mr. McIntosh went up and brought back the money and then you came in or about that time, or just before, and the examination took place. Q. Directing your attention to any unusual circumstances which may have influenced the mind of the defendant in making any statements, do you remember anything unusual there? A. Nothing at all. Everything was just usual, formal, no inducement of any kind. Q. Were any threats made to this defendant? A. None whatsoever. Q. Any inducements? A. None at all. Q. Promises? A. None at all. Q. Did you or I have any guns or black-jacks on us? A. I don't remember that we did. I don't think so. It was orderly, peaceful and quiet in the room. * * * Q. Did he" (the defendant) "appear calm and collected as he came in, or was he frightened? A. He didn't appear to be frightened. He appeared to be calm and collected. He told me himself, 'I intended to give myself up anyway.' " The stenographer who took stenographic notes of the defendant's statements and who made from those

notes the transcript which was offered in evidence, was asked: "Q. Will you give the court and jury the circumstances under which these statements were made, directing your attention to anything unusual which may have influenced the defendant in making these statements, if you remember anything?" and answered: "No, I was upstairs and you sent for me to come down and take the notes. I went in with my pencil and book and sat down and I saw several people there and you asked me to take the notes and Myles Fukunaga said he was perfectly willing to talk, as he thought it was all up with him, and I took it down as I heard it. * * * Q. Was Myles handcuffed at that time? A. No. He was just sitting in a chair as he is sitting now. Q. Were there any arms lying around? A. I didn't see any."

Dr. Faus, after stating that he was present at the time the defendant's statement was made and that he had talked to him and observed him, was asked: "Q. At that time you may state whether there were any threats made to him? A. There were no threats. Q. Any promises or inducements or anything of that kind? A. None. All of his statements were spontaneous." No testimony was offered by the defendant to the contrary. Nothing was elicited to the contrary in cross-examination of these or any other witnesses. It appeared from this evidence that no threats, inducements or promises of any kind were made or held out to the defendant and that his statements were uttered voluntarily. No force was used and there was no show of force. The contention is in this respect merely that the defendant was not warned prior to making his confession that it would or might be used against him in court and that he should have been so warned. Our statute does not so require. It merely requires that it shall first be made to appear that the confession was in fact voluntarily made. A confession

may well be voluntary, irrespective of whether the warning contended for was or was not given beforehand. It was not error to admit the confession without prior warning having been given to the defendant. It is worthy of note that the confession itself affords confirmation of the fact that it was made voluntarily. The defendant was first asked questions tending to elicit his age, where he had been educated and to what extent, what his occupations had been and who his relatives were. The following then took place: "Q. Do you know Mr. Jamieson up there, Mr. Fred Jamieson? A. I don't know him. Those I know I could not harm them. Everything was luck with me. I don't know. Q. You want to tell us about this, don't you? A. Everything. Yes, the truth. Q. Perfectly willing? A. Sure. Perfectly willing. Q. Just tell us how you planned this thing, and what the reason for it was?" After making a lengthy and detailed statement of his plans and of his acts leading up to and culminating in the murder, the defendant was asked: "You are telling this to us voluntarily? A. What you mean, voluntary? Against my wishes? Q. Are you telling this willingly, voluntarily and not against your wishes? A. Yes. I know it's all up, that's why. * * * Q. Were you going to give yourself up on the 25th? A. Anyway I was going to give up tonight. I was going home to tell my mother I did this thing. * * * Q. You didn't intend to give yourself up if you could spend the money? A. I was going to give up on the 25th already. I meant everything in the letter," referring to a letter sent by him to a local newspaper in which he said in effect that he would surrender on the 25th.

After the jury had been impaneled, but before the taking of any evidence, the court, at 2:12 on the afternoon of October 2, 1928, without objection on the part of the defendant, permitted the jury to separate until the

following morning at 8:30 o'clock; giving the jurors that much time within which to arrange their business and personal affairs prior to being locked up during the trial proper. This procedure is assigned as error (assignment number fifteen). Our statute (R. L. 1925, Sec. 2424) expressly provides as follows: "It shall not be necessary in any case, whether civil or criminal, for any trial jury after having been finally accepted and sworn to try the cause, to be segregated, locked up or otherwise confined at any time prior to retiring to deliberate upon their verdict; provided, however, that the court may in its discretion order and direct that the trial jury in any case, whether civil or criminal, shall be segregated, locked up or otherwise confined after being finally accepted and sworn to try the cause and until a verdict is arrived at or the jury discharged." In other words, the legislature has declared that it is optional with the trial judge whether to segregate the jury or not. Obviously, if under the command of the statute it is not necessary in any criminal case for the trial jury to be segregated at all, it was entirely proper and not error to fail to segregate it until the actual trial began with the production of evidence. The statute is clear and unambiguous.

Under assignment number fourteen it is complained that the presiding judge "perhaps unintentionally, but nevertheless erroneously intimated to the jury the futility of the defense" and that "this is apparent from its statement to the jury at the close of the third day of the trial." The statement is as follows: "You may not know that stipulations mean admissions and they are the same as if given from the witness stand. Stipulations are part of the evidence in the case to be considered by you along with the rest of the evidence in the case. The court will recess until tomorrow morning at 8:30 o'clock and the bailiff will take you to the hotel and we expect to submit

the case to you tomorrow. If any of you wish articles from home there is no objection to that. The bailiffs will telephone for you to your homes for whatever you wish. We wish to do everything we can to avoid discomfort on your part, and I am sure all you gentlemen will understand that." It is argued that "the jury could have inferred from said statement that the trial court was of the opinion that there would be no likely defense or any defense of any importance" and that "in law said statement amounted to an unconstitutional and unwarranted comment by said court upon the evidence and constituted prejudicial error." The contention is without merit. If, after the making of the statement, which was undoubtedly based upon information received from counsel for the defense as to the probable number of witnesses to be called, there had been an abundance of evidence from the defense occupying several days in its presentation, the mere fact that the court was in error in believing that the case would be concluded on the following day would have been of no consequence or significance whatever. The weight of the evidence to be adduced by the defendant would not have been affected in the slightest degree by the court's misconception of the quantity of the evidence to be produced or of the time it would take to present it. So, also, on the other hand the evidence offered by the defense having consumed in all less than half an hour for its presentation, no harm was done to the defendant. By his own acts and omissions in court it was shown that the court's surmise was correct and that fact likewise could have been of no possible consequence or significance in weighing the evidence which was adduced by the defendant as well as that which was adduced by the prosecution. If it were not for the seriousness of the case the contention might well be said to be frivolous.

Assignment number thirteen is that the circuit court

erred in overruling the defendant's motion for a new trial based upon the same alleged errors already herein considered, or some of them, and upon the additional ground of newly discovered evidence. The latter relates to the alleged late discovery that one J. C. Thompson, a medical officer of the United States Navy Yard at Pearl Harbor, on the Island of Oahu, can give evidence that the defendant was insane at the time of the commission of the offense. In support of this ground the affidavits of the said J. C. Thompson, of defendant's present attorney, and of Mr. Beebe, one of the two attorneys who acted for the defendant at the trial, were filed. No affidavit was filed by Mr. Huber, the other of the attorneys for the defendant at the trial. The affidavit of Mr. Beebe may be assumed to show that so far as he was concerned there was due diligence in searching for expert testimony tending to support the view of insanity and that as to him the evidence of J. C. Thompson is newly discovered. It is well established in this jurisdiction, however, that when a litigant is represented at the trial by more than one attorney it must expressly appear that all of his attorneys used due diligence in searching for testimony and that the alleged newly discovered evidence was not known to any of them. "In order to justify the granting of a new trial on the ground" of newly discovered evidence "it must appear that all of the attorneys who presented the movant's case at the past trials used such due diligence and that none of them were aware of the existence of the proposed evidence." *Uuku* v. *Kaio*, 21 Haw. 710, 721, 723, 726. For this reason alone the denial of the motion for a new trial must be sustained. There is another reason, however, leading to the same conclusion. The affidavit of J. C. Thompson, after reciting his own training, experience and qualifications as a physician and a psychiatrist, reads as follows: "That he

734

has carefully followed the testimony and evidence introduced in the case of Myles Yutaka Fukunaga as published in the local newspapers; and that he has made a critical study of the confession and evidence relating to the behavior of Myles Yutaka Fukunaga, and states that this material is laden with the evidence that this lad showed to a thoroughly abnormal degree the symptoms of dissociation, suggestibility, a vast amount of phantasy, an hatred component characteristic of the paranoid personality, confusion, identification, typical paranoid assertion of his sanity, marked introversion, regression, a suicide drive which failed of accomplishment followed as it is so dangerously liable to be by murdering another, which murder will insure the desired outcome of the original suicide drive, which is death; the testimony is filled with evidence relative to this lad's desire to die and for a youth without some serious physical illness, to desire to die is psychotic. With the exception of the suicide drive, none of these symptoms, if taken alone could be construed as evidence of being psychotic, but the constellation of so numerous and so characteristic a series, is ample grounds for the deponent to maintain that Myles Yutaka Fukunaga is either an incipient case of regression-dissociation psychosis or a paranoid personality of a wide variant from the norm. That in the opinion of deponent the diagnosing of this type of insanity is a matter for the mature judgment of trained specialists in the fields of psychiatry and psychoanalysis, and that from his study of this case deponent honestly believes that Myles Yutaka Fukunaga was insane on and before the 18th day of September, 1928." It does not appear from this affidavit that the deponent is acquainted with the defendant or ever examined him or spoke to him or saw him. By inference the contrary appears. The showing made is that the deponent's opinion as to the mental condition of the defendant was based

solely upon newspaper accounts of the evidence given in court and of the defendant's confession. There is no showing that the opinion was based on facts actually proven at the trial. It is a well known rule of law and of procedure, both criminal and civil, that an expert on insanity who has not examined the alleged insane person and has not been acquainted with him—an expert who, in other words, has not had opportunities for direct observation of the alleged insane person—cannot give his opinion upon assumed facts unless those hypothetical facts are supported by some, at least, of the evidence given at the trial. In other words, a foundation for the hypothetical question or for the answers based thereon must be laid by the adduction of competent evidence in the case. It would not be in accordance with correct legal procedure to permit an expert out of court, who has never seen or heard the alleged insane person, to decide for himself what the assumed facts and history of the patient shall be and then upon those assumptions form and express an opinion concerning the sanity or insanity of the patient. That would be permitting him in a degree to assume the functions of the jury. The opinion of Dr. J. C. Thompson, based as it was solely upon the newspaper reports, incomplete and inexact as they well may have been, of the testimony adduced at the trial and upon such a purported copy as he may have seen of the confession, would have been incompetent and inadmissible if offered at the original trial and is incompetent and inadmissible now. For this additional reason the order denying a new trial on the ground of alleged newly discovered evidence is sustained.

We have carefully examined the whole record. The defendant had a fair trial. He was defended by able counsel. The murder was a most atrocious one. An innocent boy of ten, wholly unable to defend himself, was

kidnapped by the defendant under false pretenses and taken, in pursuance of a deliberately formed design, to a secret place and there in cold blood deprived of the life to which he was entitled. The murder was clearly characterized by malice, deliberateness and premeditation. The overwhelming weight of the uncontradicted evidence was that the defendant was sane at the time of the commission of the offense. We can find no prejudicial error in the proceedings had at the trial. The verdict, the judgment and the sentence are affirmed.

*R. K. Murakami* for plaintiff in error.

*C. S. Davis,* City and County Attorney, and *F. M. Brooks,* Deputy City and County Attorney, for the Territory.